Tammi L. EDELMAN, Appellant,

v.

Duane F. EDELMAN, Appellee.

Nos. S–8562.

Supreme Court of Alaska.

June 16, 2000.

C. Michael Hough, Homer, Attorney for Appellant.

Allison E. Mendel, Mendel & Associates, Anchorage, Attorney for Appellee.

Before MATTHEWS, Chief Justice, EASTAUGH, FABE, BRYNER, and CARPENETI, Justices.

*OPINION*

CARPENETI, Justice.

## I. *INTRODUCTION*

This case presents difficult problems arising from the superior court's resolution of contested property and alimony issues, which occurred over three and one-half years after the grant of divorce. We address three major issues—(1) the division of the marital property, (2) alimony, and (3) attorney's fees. The first issue, property division, has several sub-parts; we affirm the superior court's decision in some respects and reverse it in others. We affirm the superior court's decision regarding alimony. Finally, we remand the superior court's denial of attorney's fees in light of our resolution of the other issues.

## II. *FACTS AND PROCEEDINGS*

Tammi and Duane Edelman were married in 1976. The only child of this union, J.E., was born in 1983. Tammi and Duane separated in October 1992.

Tammi filed for divorce in June 1993. The superior court issued an order granting joint legal custody of J.E., but primary physical custody to Tammi. The court also ordered Duane to pay Tammi $2,000 per month in interim spousal support.

On April 14, 1994, the superior court[1] granted Tammi a decree of divorce. However, the court did not address the issues of debt and property distribution, alimony, or child custody or support. Two days later, the court granted sole physical custody of J.E. to Tammi, ordering Duane to pay $600 monthly in child support.

The division of the couple's property, however, was not resolved until more than three-and-a-half years later.[2] On January 23, 1998, the superior court issued a memorandum decision and order (1) dividing the couple's property and debts; (2) denying Tammi future alimony and vacating all of Duane's alimony arrearages; and (3) denying Tammi's request for attorney's fees. Tammi ap-

---

1. The Honorable Charles K. Cranston presiding.

2. Judge Cranston had in the meantime retired. The Honorable Harold M. Brown presided at the trial. As Judge Brown noted in his Memoran-

dum Decision and Order, "[t]his has been an especially tough case to resolve because of the lengthy passage of time between separation and resolution."

peals all three of these rulings; we deal with each in turn.

## III. DISCUSSION

### A. Property Division

#### 1. Standards of review

■ Trial courts have broad discretion in fashioning property divisions.[3] We are not to set aside their factual determinations unless they are clearly erroneous.[4] We review trial courts' allocations of property under the abuse of discretion standard, and we will only reverse them if they are clearly unjust.[5]

■ However, with regard to legal analysis employed at the trial court level, our review is based on our independent judgment;[6] we adopt "the rule of law that is most persuasive in light of precedent, reason, and policy."[7]

#### 2. The statutory rule

Under Alaska statutory law, property divisions in divorces are to be made "in a just manner and without regard to which of the parties is in fault ...; the division of property must fairly allocate the economic effect of divorce."[8] This process is commonly referred to as "equitable division."

#### 3. The Wanberg formula

■ To help courts carry out this responsibility, we set out the following procedure in the seminal *Wanberg* decision:

Equitable distribution of marital assets by the superior court involves a three-step procedure. First, the trial court must determine what specific property is available for distribution. Second, the court must find the value of this property. Third, it

must decide how an allocation can be made most equitably.[9]

#### 4. Identification and valuation of marital property

##### a. The set net permit

■ The first item of property that the superior court dealt with was a set net permit, which allows the holder to catch salmon in Cook Inlet. The permit was in Duane's name. The court analyzed the permit in this way:

the set net permit was acquired by [Duane] prior to marriage and[,] despite its use during marriage as a source of income[,] there is little credible evidence that [Duane] intended that the permit would become a part of the marital estate. The set net permit will be treated as a premarital asset of [Duane] that is not subject to distribution.

Tammi argues that this was erroneous. She states that

the permit was of negligible value when issued in 1975 and its function was simply as an item that permitted Mrs. Edelman and Mr. Edelman to work and develop their fishing business during the eighteen years of their marriage. The set net permit should have been viewed as part of the marital estate.

Tammi does not point to any evidence in the record to support her contentions.

Tammi and Duane both correctly rely on *Wanberg* for the test to determine when invasion of a spouse's property acquired before marriage is appropriate. As Duane notes, Tammi apparently does not dispute that the permit was Duane's separate property, acquired before marriage. The *Wanberg* court held:

---

**3.** See *Bellanich v. Bellanich*, 936 P.2d 141, 143 (Alaska 1997) (citing *Cox v. Cox*, 882 P.2d 909, 913 (Alaska 1994)); *Wanberg v. Wanberg*, 664 P.2d 568, 570 (Alaska 1983).

**4.** See Alaska R. Civ. P. 52(a); *Bellanich*, 936 P.2d at 143.

**5.** See *Bellanich*, 936 P.2d at 143 (citing *Compton v. Compton*, 902 P.2d 805, 808 n. 2 (Alaska 1995)).

**6.** See *Wanberg*, 664 P.2d at 570 (citing *Walsh v. Emerick*, 611 P.2d 28, 30 (Alaska 1980)).

**7.** *Id.* (quoting *Guin v. Ha*, 591 P.2d 1281, 1284 n. 6 (Alaska 1979)).

**8.** AS 25.24.160(a)(4).

**9.** *Wanberg*, 664 P.2d at 570 (footnote omitted).

In limited circumstances invasion of one spouse's property acquired before coverture may be required as a matter of law. One such circumstance is where the parties, by their actions during marriage, demonstrate their intention to treat specific items of property as joint holdings, even though the properties were separately held by one or another spouse prior to coverture. Such intention is manifest when both spouses can be shown to have taken an active interest in the ongoing maintenance, management, and control of specific assets. Where such circumstances exist, basic fairness requires that property treated by the spouses as jointly held be available for equitable division under [former] AS 09.55.210(6).[10]

Duane testified that, despite the fact that he and Tammi shared the proceeds generated from the permit, he never considered it something that he would share with Tammi. Rather, he planned to assign it to his son J.E. when J.E. began fishing the permit.

Further, as Duane cogently points out, "Tammi and Duane fished the permit together to produce income, but all the required management and maintenance of the permit itself was performed by Duane, alone, who completed and filed all the required paperwork and paid all the necessary fees."[11] This case therefore differs markedly from *Wanberg*, where one spouse had performed a great deal of work in maintaining, improving, and managing two rental properties.[12] Duane correctly concedes that the proceeds from the couple's joint fishing enterprise are marital, having consistently been shared by the parties during their marriage. However, the record does not show that Tammi ever took any action to maintain, manage or control the permit itself. Therefore, the superior court's finding that the set net permit was Duane's separate property and not part of the marital estate was not clearly erroneous.[13, 14]

### b. *The marital residence*

■ Next, the superior court addressed the parties' marital residence. The court identified this asset as "consisting of approximately [8.79] acres including outbuildings located thereon." The court valued this property at $202,500 and found that it was subject to a mortgage of approximately $52,000,[15] deriving a net value of $150,000. Finally, it found that Tammi "has continued to reside in the marital home since separation, divorce and remarriage.... This residence and the real property upon which it sits are awarded to [Tammi] who will be solely responsible for the payment of the mortgage and any other indebtedness incurred in relation to the property."

Tammi contests the court's valuation of this property. She asserts that the superior court's use of the $202,500 figure as the value of the property was incorrect. Her first argument is that this valuation arose from the court's incorrect treatment of the 8.79 acre property as though it were subdivided into five lots—a subdivision which never, in fact, occurred. Tammi asserts that "[t]he residential property awarded Mrs. Edelman consists of one lot and has never been treat-

---

**10.** *Wanberg*, 664 P.2d at 571 (footnotes omitted). Alaska Statute 09.55.210(6) was the precursor to current AS 25.24.160(a)(4).

**11.** It is not clear from the record whether the fees were paid with Duane's separate assets or with marital assets. If the latter were the case, it might strengthen Tammi's argument to some degree. However, because the evidence is inconclusive—Tammi merely argues that the fees were "presumably" paid with marital funds—she has failed to carry her burden of proof on this issue.

**12.** *See Wanberg*, 664 P.2d at 571–73.

**13.** *See also Nicholson v. Wolfe*, 974 P.2d 417, 424 & n. 26 (Alaska 1999) (holding that, in absence of "act or acts that demonstrate the parties' intent to treat the [separate] property as marital," separate property could only be invaded if trial court "specifically found that a balancing of equities between the parties required invasion of the premarital holding") (internal quotation marks and citation omitted). As in *Nicholson*, the "circumstances here do not appear to require invasion of separate property." *Id.* at 424 n. 26.

**14.** Since the set net permit is Duane's separate property, Tammi's depletion of assets argument fails.

**15.** The court found that an IRS tax lien on the residence would be satisfied by payments from Duane's bankruptcy estate; therefore, it did not subtract this lien from the residence's value.

ed by either party as more than one lot." She would have the court use $165,000 as the starting point in valuating the property instead.

Tammi cites a September 1994 appraisal for this figure. The appraiser estimated the market value of the house and the lot on which it sits at $165,000. The "lot" for the purposes of this appraisal was the entire 8.79 acres. The parties appear to be in basic agreement that this appraisal was correct.

The superior court's valuation seems to stem from a second appraisal, also conducted in September 1994. This appraisal recapped the original appraisal of $165,000, but also summarized the market value of the property based on a "preliminary plat" reflecting a subdivision of the lot into five smaller lots.[16] The appraiser stated that the value of the entire property, if it were subdivided, would be $202,500.[17]

Tammi contends—and Duane does not dispute—that the property was never subdivided. Tammi further asserts that various steps would have to be taken before the subdivision plat could become a reality, including providing for roads, utilities, surveys, and Borough approval of the plan. Duane does not refute these contentions either.

The record does not show whether all of Tammi's arguments in this regard are true. However, at least as to the road, the appraiser's diagram of the property supports her argument. The diagram shows the five proposed lots with a cul-de-sac from the main road providing access to each. Tammi's unchallenged testimony was that this cul-de-sac was never built. Further, examination of the

"Subdivision—Final Plat" chapter of the Kenai Peninsula Borough Code shows that a number of specific requirements—some involving considerable potential expense—must be satisfied before the Borough grants final approval to any subdivision plan.[18] Thus, the superior court should not have used the subdivided $202,500 figure to arrive at the value of the property; rather, it should have used the unsubdivided $165,000, a figure with which both parties agreed. To use the former was clearly erroneous.

■ Tammi's argument goes even further, however. She argues that even this $165,000 figure overstates the house's value, citing statements by Duane in bankruptcy and an alleged valuation by the Kenai Peninsula Borough as of the date of trial.[19]

As noted above, however, the trial court record shows that both Tammi and Duane agreed that the $165,000 appraisal was an appropriate valuation of the property. Tammi herself specifically agreed, when asked at trial, that the $165,000 was a "fair value for the property indicated in the appraisal." Duane's counsel also indicated that he and Duane were "willing to go with" the "$160,000 something" appraisal. Further, in response to Duane's counsel's statement that he didn't "think it's necessary to have up-to-date appraisals on the house, if nobody does, so I don't think there's a problem there," Tammi's counsel responded "Okay." Therefore, both Tammi and Duane are precluded from now arguing that this appraisal was incorrect.

■ Tammi's final argument regarding the value of the residence goes to the issue of

---

**16.** This preliminary plat is outlined in the August appraisal as well, although in that document the appraiser only estimated the value of the 2.66 acre parcel on which the house would sit were the property subdivided. The appraiser estimated the value of the hypothetical 2.66 acre parcel and the residence at $151,000.

**17.** $151,000 + $19,500 + $10,000 + $10,000 + $12,000 = $202,500.

**18.** See, e.g., Kenai Peninsula Borough Code 20.16.030 (requiring certification that all taxes on property are paid);—.060 (requiring statement from city official that "improvements required by city ordinance are or will be installed"); -.155(B)

(requiring surveyor's certificate); -.155(C), -.170, -.180 (requiring Planning Commission approval); -.155(D) (requiring engineer's certificate of compliance with wastewater standards).

**19.** The page of the record cited by Tammi to support this latter valuation is a foreclosure notice from the Borough. It shows that over $9,000 is owed on the property. Scrawled on the bottom of the form are some figures which appear to deal with the value of the property; however, it is unclear who wrote these figures. Thus, we have given them no credence as a statement of the Borough's assessed value of the property.

debt. She agrees that the mortgage on the property was approximately $52,000 at the time of trial. However, Tammi contends that this figure reflects post-separation payments made by her. Tammi argues that these post-separation payments are her separate property, and that they increased the equity of the residence. Without explicitly saying so, she in effect argues that she should be credited, in the eventual equitable division, for these expenditures on behalf of the marital property.

It appears that Tammi made these payments. At trial, she testified that she had made all of the mortgage payments since she filed for divorce. This has not been disputed by Duane, and the record reflects that payments on the mortgage were made in 1993.

Tammi's legal contentions find some support in our decisions. We have repeatedly observed:

> This court has required that trial courts consider payments made to maintain marital property from post-separation income when dividing marital property. The fact that one party has made payments from non-marital income to preserve marital property should be considered as one of the circumstances to be weighed by the trial court in dividing the marital property.[20]

We have declined, however, to fashion an absolute rule that the spouse who makes such payments must be credited for them in the final property division.[21] We have previously stated that "no fixed rule requiring credit in all cases should be imposed. Instead, the fact that one party has made payments from non-marital income to preserve marital property should be considered as one of the circumstances to be weighed by the

trial court in dividing the marital property."[22] Since we cannot tell from the record whether the trial court considered this issue, we must remand for findings from that court as to whether Tammy should receive credit for post-separation payments made on the mortgage of the marital residence.[23]

### c. The Exxon Valdez claims

The next items of property at issue are Duane's claims in the litigation arising from the Exxon Valdez disaster, which released 11 million gallons of North Slope crude into Prince William Sound. The superior court dealt with these claims as follows:

> the Exxon Valdez claims are a marital asset, but the value of the claims [is] speculative. [Tammi] state[s that] the claims are "presently known" but does not, understandably, elaborate as to their value. The parties['] interest in the Exxon Valdez claims, whatever that is, is awarded to [Duane]....

Tammi argues that this allocation was in error, and that she should receive fifty percent of the value of these claims.

Tammi correctly cites our Lundquist[24] decision as controlling of this issue. That case presented facts very similar to this case. One spouse, George, had claims against Exxon for damages resulting from the same disaster.[25] George and his wife Jean divorced; George argued that these claims were his separate property, while Jean argued that they were marital property.[26]

The Lundquist court tied compensatory awards to the type of compensation involved:

> In Alaska, a tort recovery is classified according to what it is intended to re-

---

**20.** Brotherton v. Brotherton, 941 P.2d 1241, 1246 (Alaska 1997) (quoting Cox v. Cox, 882 P.2d 909, 919 (Alaska 1994)).

**21.** See Ramsey v. Ramsey, 834 P.2d 807, 809 (Alaska 1992).

**22.** Id.

**23.** We note that the Ramsey rule was formulated in the context of post-separation payments on the marital residence made by the party who was not occupying the residence. See id. See also Dod-

son v. Dodson, 955 P.2d 902, 912 (Alaska 1998) (applying Ramsey rule); Harrelson v. Harrelson, 932 P.2d 247, 253 (Alaska 1997) (applying Ramsey rule). The present case involves post-separation payments made by the party who was occupying the residence.

**24.** Lundquist v. Lundquist, 923 P.2d 42 (Alaska 1996).

**25.** See id. at 49.

**26.** See id.

place.... When an award compensates for losses to the marital estate it is marital property. To the extent the recovery compensates for losses to a spouse's separate estate, it is his or her separate property.[27]

Regarding George's expected award of punitive damages, we held that

> punitive damages can be partially marital and partially separate, or even entirely one or the other, depending on the facts. An award of punitive damages should be apportioned in the same manner as the underlying compensatory damages award.[28]

We decided that the compensatory damages in *Lundquist* were marital property because they were to compensate for George's fishing losses, not for any loss in the value of his permit.[29] Because the award replaced lost fishing income during a period when the parties were married, we held that the trial court had correctly characterized it as marital property.[30] Accordingly, we upheld the superior court's characterization of the punitive damages award as marital as well.

#### i. *Compensatory damages*

■ Here Duane had asserted two compensatory claims, a "tender"[31] claim, and a "set net" claim. In the tender claim, Duane expressly states that he is seeking damages for lost income from herring and salmon hauling for 1989. Because these damages occurred during the marriage, any recovery for them is marital property.

In the "set net claim," Duane alleges two types of damages: (1) compensatory damages for loss of revenue in 1989–91 due to the drop in price of sockeye salmon, and (2) damages for devaluation of his set net permit.

Any damages award for lost income, like that in *Lundquist*, would be marital property—Duane is seeking to replace "lost fishing income during a period when the parties were married."[32] Any damages award for devaluation of the permit, however, would be meant to replace the lost value of Duane's permit. As discussed above, the permit is Duane's separate property; therefore, under *Lundquist*, this latter type of recovery would be Duane's separate property as well.

#### ii. *Punitive damages*

■ The Exxon Valdez plaintiffs were awarded more than $4.786 billion in punitive damages. This award has been appealed to the Ninth Circuit Court of Appeals. Accordingly, it is not known how much will be collected or even if the plaintiffs will ever actually collect this award.

This uncertainty appears to have affected the superior court's decision, though it need not have. Under *Lundquist*, punitive damages are to be allocated in exactly the same way that compensatory damages are.[33] Therefore, any punitive damages that are eventually awarded to Duane should be allocated in accordance with the above characterizations of the compensatory awards.

#### d. *The pension fund*

■ Finally, Tammi contests the superior court's allocation of Duane's entire pension fund to him. The court dealt with the valuation and allocation of Duane's pension fund in this way: "The total contributions during marriage on behalf of [Duane] are approximately ... $31,475.68.... [Duane]'s pension contributions earned during marriage are awarded to [Duane]."

■ The court did not state whether it considered the fund to be separate or

**27.** *Lundquist,* 923 P.2d at 50 (quoting *Bandow v. Bandow,* 794 P.2d 1346, 1348 (Alaska 1990)) (internal quotations omitted).

**28.** *Id.* at 51 (citing Scott A. Hennis, *Punitive Damages: Community Property, Separate Property, or Both,* 14 Community Prop. J. 51, 55 (1987)).

**29.** *See id.* at 50.

**30.** *See id.*

**31.** *See Forquer v. State, Commercial Fisheries Entry Comm'n,* 677 P.2d 1236, 1245 n. 3 (Alaska 1984) ("A fish tender delivers fish from the fishing boats to the processing plant.").

**32.** *Lundquist,* 923 P.2d at 50.

**33.** *See id.* at 51 (citation omitted).

marital property. This court has held that "[t]o the extent that a party earns retirement benefits during marriage, the benefits are marital assets and are subject to equitable division."[34] Therefore, Tammi is entitled to a share of the marital portion of the fund, or at least to a portion of another part of the marital estate equal to her share of the fund.[35] For the court to award the entire fund to Duane without accounting for Tammi's share of the marital portion was erroneous as a matter of law.[36]

▮ Further, the superior court's valuation of the fund was problematic. The court appears to have correctly calculated the amount contributed to the fund during the couple's marriage.[37] However, this figure does not accurately state the value of Duane's vested pension benefits.[38] The court understated the value by not including Duane's employer's contribution nor any interest or investment return that has been and will be generated by the fund. This should be corrected on remand.[39]

Here, the court did not use either of the two approved methods of distributing pension benefits (i.e., a QDRO or lump-sum payout).[40] Its valuation probably understates the actual value of the pension fund; Duane presumably stands to collect more than was contributed due to interest that has accrued and will continue to accrue on the funds. In any event, these are issues for the trial court to determine on remand, as discussed above.

### 5. Equitable division

▮ The superior court did not specifically advert to the final part of the *Wanberg* three-part process for property division, that is, it did not state "how an allocation can be made most equitably."[41] The superior court did not discuss whether it was making an equal—and, hence, presumptively equitable—division of the property.[42] Nor did it analyze the division using the statutorily required factors of AS 25.24.160(a)(4),[43] com-

---

**34.** *Wahl v. Wahl*, 945 P.2d 1229, 1231 (Alaska 1997) (citing *Rice v. Rice*, 757 P.2d 60, 61 (Alaska 1988)).

**35.** *See Morlan v. Morlan*, 720 P.2d 497, 498 (Alaska 1986) ("pension rights should generally be awarded to the employee spouse if there is other marital property of appropriate worth which can be awarded to the non-employee spouse") (citing *In re Marriage of Gillmore*, 29 Cal.3d 418, 174 Cal.Rptr. 493, 629 P.2d 1, 7 (1981)). It was not possible to do so in *Morlan* because "the value of the pension exceeded the value of all the other marital assets." *Id.* Because in this case the pension fund value does not exceed the value of the other marital assets, the court probably should have awarded the fund itself to Duane and made up for Tammi's share via the allocation of other marital property to her.

**36.** As we recently reiterated, "[t]rial courts have discretion to distribute retirement benefits either through a qualified domestic relations order (QDRO) or through a lump[-]sum payout." *Nicholson v. Wolfe*, 974 P.2d 417, 425–26 (citing *Laing v. Laing*, 741 P.2d 649, 655–58 (Alaska 1987)) (footnote omitted).

**37.** Apparently, the superior court used the "retirement worksheet" included in the record to reach this figure. The court seems to have added up the contributions made from the 76/77 "plan year" to the 91/92 "plan year," which total $31,475.68. Without knowing when the 91/92 plan year ended and the 92/93 plan year began, it is impossible to know whether this

figure correctly reflects the payments made during marriage, or whether it reflects post-separation payments as well. However, the court's methodology is not clearly erroneous, and, as discussed below, this figure is not the correct one for purposes of valuating the fund in any event.

**38.** It is undisputed that the pension fund is vested—i.e., that if Duane's employment were terminated immediately he would be entitled to future pension benefits. *Cf. Laing v. Laing*, 741 P.2d 649, 655 n. 8 (Alaska 1987) ("When a pension or retirement benefits plan is vested but not matured, an employee is absolutely entitled to benefits, though he [or she] is not entitled to actual payments until some future date." (citations omitted)).

**39.** *See Hartland v. Hartland*, 777 P.2d 636, 641 (Alaska 1989) (remanding pension fund for determination of benefits' present value).

**40.** *See Nicholson*, 974 P.2d at 425–26 (citation omitted).

**41.** *Wanberg*, 664 P.2d at 570 (footnote omitted).

**42.** *See id.* at 575.

**43.** AS 25.24.160(a)(4) provides, in part:
[T]he division of property must fairly allocate the economic effect of divorce by being based on consideration of the following factors:
 (A) the length of the marriage and station in life of the parties during the marriage;

monly referred to as the *Merrill* [44] factors because they stem from that opinion. [45] As a consequence of this lack of "sufficiently detailed and explicit findings" required by Alaska Rule of Civil Procedure 52(a), we are without the "clear understanding of the basis of the trial court's decision" to "enable [us] to determine the ground on which the trial court reached its decision." [46] Therefore, we must remand this issue to the superior court, and on remand the superior court must allocate the marital assets equitably in accordance with any applicable factors enumerated in AS 25.24.160(a)(4).

### B. *Alimony*

Tammi argues that the superior court erred when it vacated the alimony arrearages that Duane owed Tammi and denied her future alimony. The superior court's decision in this respect was correct and we affirm it.

The original alimony order in this case was issued in October 1993; it required Duane to pay Tammi $2,000 per month in "interim spousal support." [47] The court did not label this support "rehabilitative" or "reorientation" support, and made no findings regarding this award.

Duane moved for modification of those payments, but the court denied that motion in August 1995, ordering that

the spousal support payments become permanent until the pending bankruptcy proceedings against Mr. Edelman are resolved and adequate financial information

(B) the age and health of the parties;
(C) the earning capacity of the parties, including their educational backgrounds, training, employment skills, work experiences, length of absence from the job market, and custodial responsibilities for children during the marriage;
(D) the financial condition of the parties, including the availability and cost of health insurance;
(E) the conduct of the parties, including whether there has been unreasonable depletion of marital assets;
(F) the desirability of awarding the family home, or the right to live in it for a reasonable period of time, to the party who has primary physical custody of children;
(G) the circumstances and necessities of each party;

regarding both parties is presented to the Court to support a termination of spousal support.

Duane was unable to make all of these payments, eventually falling some $30,000 behind on alimony and $9,000 behind on child support. At the same time, he was in personal bankruptcy proceedings. Tammi's unliquidated claim for back support presented a problem for the bankruptcy trustee; apparently the trustee refused to begin liquidating Duane's assets to pay off the creditors until Duane's debt to Tammi was reduced to a sum certain.

At the parties' request, the court held a hearing for the purpose of fixing Duane's arrears to Tammi at a definite dollar amount. The court issued an order, "based on the agreement of the parties," entering judgment against Duane for his arrearages and reaffirming its spousal and child support orders. However, Duane's counsel made it clear that he still considered the support orders unduly burdensome. Further, Duane's counsel stated that he believed that spousal support—unlike child support—could be retroactively modified. The court did not rule on the issue of the propriety of the support amount, reserving it and other property division issues for trial.

Trial was held on May 30, 1997. On August 19, the court issued a preliminary order vacating Duane's spousal support obligation and increasing his monthly child support obligation to $1,132.29.

(H) the time and manner of acquisition of the property in question; and
(I) the income-producing capacity of the property and the value of the property at the time of division.

44. *Merrill v. Merrill*, 368 P.2d 546 (Alaska 1962).

45. *See id.* at 547 n. 4.

46. *Id.* at 548 (quoting *Irish v. United States*, 225 F.2d 3, 8 (9th Cir.1955); *United States v. Horsfall*, 270 F.2d 107 (10th Cir.1959)) (internal quotation marks and footnote omitted).

47. In the divorce decree of April 1994, Duane was also assessed $600 per month in child support.

Finally, in its decision and order, the court ruled on the alimony issue:

> Although[ ] [Tammi] argues that she was and is in need of "rehabilitative alimony[,]" she has provided no basis for this Court to conclude that spousal maintenance is just and necessary. In fact, she remarried several years ago and has given birth to two additional children. If any person is obligated to support [Tammi], it is [Tammi]'s current husband. Further, the Court is of the opinion that the amount of maintenance ordered by the Court on [October 8, 1993], despite the stipulation of the parties[,] was unfair and was not just or necessary.

The court accordingly vacated Duane's spousal support arrearages. Tammi appeals the court's vacation of both her past and future spousal support.

### 1. Standard of review

 The superior court has wide discretion in making alimony determinations.[48] We will not interfere with such determinations unless the superior court abused its discretion.[49]

### 2. Discussion

In *Davila v. Davila,*[50] we summarized our case law concerning alimony:

> Our decisions have recognized reorientation alimony as appropriate to allow the requesting spouse an opportunity to adjust to the changed financial circumstances accompanying a divorce. We have indicated, however, that reorientation alimony should ordinarily be awarded only when the property settlement will not adequately meet the parties' reasonable needs. Furthermore, given its inherently transitional nature, reorientation alimony may properly be awarded only for relatively short periods of time.
>
> Our decisions have also recognized that a separate form of temporary support, rehabilitative alimony, may be appropriate in some cases for a specific purpose and a short duration even with an adequate property division. While an award of rehabilitative alimony need not be predicated on a finding that the parties' needs cannot be met through the division of marital property, this form of alimony is narrowly restricted to job training or other means directly related to entry or advancement within the work force, and the party seeking rehabilitative alimony must intend to use it for such purposes.[51]

 Given these requirements for alimony, the superior court acted well within its discretion in ending Duane's $2,000 monthly alimony obligation. Tammi had remarried more than three years earlier; this alone normally suffices to cut off any alimony obligation on the part of the former spouse.[52]

Further, even assuming that Tammi was entitled to some measure of reorientation alimony, an examination of the record reveals that Duane had already provided Tammi with considerable support by the time the court entered its order. The record demonstrates that Duane had paid over $45,000 in spousal support to Tammi from 1994–1997. This amount was surely adequate to get Tammi "back on her feet," the purpose of reorientation alimony.[53] Accordingly, we conclude that the court did not abuse its discretion in ending Duane's prospective alimony obligation.[54]

 The propriety of the trial court's decision to vacate all of Duane's alimony arrearages is a closer question. The trial

48. *See Brotherton,* 941 P.2d at 1247 (citing *Faro v. Faro,* 579 P.2d 1377, 1380 (Alaska 1978)).

49. *See id.* (citing *Faro,* 579 P.2d at 1380).

50. 876 P.2d 1089 (Alaska 1994).

51. *Id.* at 1094–95 (internal footnote, citations, brackets, quotation marks, and ellipsis omitted).

52. *See, e.g., Voyles v. Voyles,* 644 P.2d 847, 849 (Alaska 1982) ("by the act of remarriage, the formerly dependent spouse elects to abandon the alimony provision established at the termination of the spouse's preceding marriage").

53. *See Davila,* 876 P.2d at 1094.

54. Of course, the trial court on remand should factor in the amount of the marital estate that Tammi has already received when it undertakes its equitable division of the marital estate. *See* Part III.A.5., *supra.*

court derived its authority to enter its interim order of spousal support under AS 25.24.140(a)(2).[55] Given the inherently provisional nature of interim orders and the fact that AS 25.24.140(a) does not prohibit modification,[56] we conclude that the discretionary regime set up by this statutory system provides the trial court with the discretion to modify interim spousal support orders. Given the facts of this case, we further hold that the trial court did not abuse its discretion in modifying the interim order of spousal support.

### C. Attorney's Fees

■■■ At the conclusion of proceedings below, the trial court denied without explanation Tammi's motion for an award of attorney's fees. Tammi appeals the court's decision, but fails to specify in her briefing both the basis for any award and the amount she seeks. This would normally be fatal to her argument, but because this matter must be remanded for findings concerning valuation and distribution of property, we remand the issue of attorney's fees for the trial court to decide after it has resolved the property issues. That decision "[must] be based primarily on the relative economic situations and earning powers of the parties." [57]

### IV. CONCLUSION

The superior court's decision is AFFIRMED in part, REVERSED in part, and REMANDED for further proceedings in accordance with this opinion.

---

**55.** AS 25.24.140(a)(2) provides:

> During the pendency of the action, a spouse may, upon application and in appropriate circumstances, be awarded expenses, including reasonable spousal maintenance, including medical expenses.

**56.** *See id.*

**57.** *Beard v. Beard,* 947 P.2d 831, 833 (Alaska 1997) (quoting *Kowalski v. Kowalski,* 806 P.2d 1368, 1372 (Alaska 1991)) (internal quotation marks omitted).