NOTICE

*Memorandum decisions of this court do not create legal precedent. A party wishing to cite such a decision in a brief or at oral argument should review Alaska Appellate Rule 214(d).*

THE SUPREME COURT OF THE STATE OF ALASKA

| | | |
|---|---|---|
| JOHN C. CATES, | ) | |
| | ) | Supreme Court No. S-18323 |
| Appellant, | ) | |
| | ) | Superior Court No. 3AN-18-10464 CI |
| v. | ) | |
| | ) | MEMORANDUM OPINION |
| LANA J. CATES, | ) | AND JUDGMENT* |
| | ) | |
| Appellee. | ) | No. 2042 – August 21, 2024 |
| | ) | |

Appeal from the Superior Court of the State of Alaska, Third Judicial District, Anchorage, Josie Garton, Judge.

Appearances: Roberta C. Erwin, Palmier ~ Erwin, LLC, Anchorage, for Appellant. Michael Gershel, Law Office of Michael Gershel, Anchorage, for Appellee.

Before: Maassen, Chief Justice, and Borghesan, Henderson, and Pate, Justices. [Carney, Justice, not participating.]

## I. INTRODUCTION

This appeal arises out of property division upon divorce. After the husband's repeated refusal to comply with discovery orders regarding marital property, the superior court sanctioned him by precluding him from presenting evidence about the marital estate at trial. After trial, at which the wife presented the limited evidence she had, the court divided marital property 73/27 in the wife's favor. The court awarded

---

\* Entered under Alaska Appellate Rule 214.

the husband a number of assets (including his medical practice), the value of which was unknown due to his failure to provide discovery.

On appeal the husband does not challenge the preclusion order, but he argues the superior court failed to do enough to explain its implications to him as a self-represented litigant. The husband also argues the court violated his due process rights by failing to inquire whether he was competent to participate in trial after he made statements about being depressed. Finally, the husband argues the court erred in the valuation of some assets and treatment of other assets as marital property. Seeing no error, we affirm the superior court's decision.

## II.  FACTS AND PROCEEDINGS

John and Lana Cates were married in May 2001. John filed for divorce in November 2018. Both parties were represented by counsel. At the time of the divorce, two of their children were adults and the third was still a minor. The superior court scheduled the divorce trial for August 2019.

In July 2019 Lana filed a motion to compel, alleging that with trial only a month away, John had not provided any of his initial disclosures.[1] The superior court granted the motion, ordering John to provide his complete Civil Rule 26.1 disclosures within ten days. On August 1 Lana moved to continue the trial because John had yet to provide his initial disclosures. The court initially continued the trial to November 2019, then again to April 2020.

In February 2020 John's attorneys moved to withdraw for cause, citing deterioration of the attorney-client relationship. The superior court approved the withdrawals in March. Lana filed for another continuance the same month, alleging

---

[1]  *See* Alaska R. Civ. P. 26.1(b) (requiring disclosure of various information related to parties' debts and assets in divorce or separation action within 45 days of filing answer).

that John had still not provided his required disclosures. The court rescheduled the trial for July 2020.

John appeared unrepresented at a status conference on June 23, at which the court ordered him to provide initial disclosures within thirty days. John claimed he could not access records regarding real property, taxes, and his businesses because of a civil protective order preventing him from being within 500 feet of the family residence except for child transfers. The court informed John of the court system's Family Law Self Help Center, encouraged him to visit its website, and explained to him the contours of Civil Rule 26.1.

One of John's former attorneys appeared on John's behalf at an August 3 status hearing and at five subsequent hearings. Because John continued to withold his full initial disclosures, the court rescheduled the trial twice more.

In September 2021 the attorney again moved to withdraw, stating that "[t]he attorney[-]client relationship has ended due to an inability to communicate." The attorney explained that John no longer responded to communications from him and that he had "requested various documents and information necessary to move this case forward for trial but [did] not receive any response from [John]." The superior court accepted the attorney's withdrawal. The court once again rescheduled the trial, this time for December 2021.

Lana later moved for a Civil Rule 37 preclusion order,[2] arguing that the court had "used carrots (trial continuances to provide more time) and sticks (orders to compel) in a futile effort to compel John's Rule 26.1 compliance." The superior court entered a preclusion order against John. The court found that John's failure to comply

---

[2] *See* Alaska R. Civ. P. 37(b)(2)(B) ("If a party . . . fails to obey an order to provide or permit discovery, . . . the court in which the action is pending may make . . . [a]n order refusing to allow the disobedient party to support or oppose designated claims or defenses, or prohibiting that party from introducing designated matters in evidence.").

with the disclosure requirements of Rule 26.1 had been "willful and protracted" and "prejudiced Lana in her ability to identify the metes and bounds of the marital estate, and to prepare for trial." The order "barred [John] from litigating the marital estate . . . , whether through the presentation of testimony, the proffering of exhibits, or cross-examination." The order did not impact John's ability to litigate custody. In concluding that the sanction was "appropriate, proportional to the degree of noncompliance and necessary to protect Lana from an unjust outcome," the court emphasized that it had unsuccessfully sought John's compliance through other lesser sanctions.

The parties went to trial in December 2021.[3] Lana filed a trial brief, but John did not. John was not represented by counsel.

Lana offered testimony about the parties' finances and property. John is a physician with his own practice. Lana testified that John made most of the family's income and that she was primarily a stay-at-home parent.

Lana testified about four residential properties — in Anchorage, Girdwood, Seward, and Mexico. Lana testified that, although John had owned some of the homes before the marriage, he had conveyed the Anchorage property to her during the marriage, and the couple had either purchased the remaining properties together or invested substantial marital resources in them during the marriage.

Lana testified about a medical technology start-up called Mobile IV, LLC that she and John invested in during the marriage. She testified that they had invested between $350,000 and $382,500 in the company.[4]

---

[3] The court awarded Lana sole legal and primary physical custody of their minor child. John does not appeal the custody ruling.

[4] Lana testified that shortly before she and John separated, John presented her with a handwritten note showing the value of the Mobile IV investment as $350,000. She testified that she was not certain whether this represented the investment's current worth at the time or the amount the parties had contributed to the company. The court

The court accepted the identification and valuation of assets Lana offered and adopted her proposed distribution of the estate. The court found that Lana's valuations were "well-supported with the best evidence that she had available to her, given the absence of reciprocity in discovery." The court divided the estate so that Lana received a 73% share and John received a 27% share. Those figures reflected only the assets that could be assessed without John's disclosures; the property table accompanying the order shows vacant entries in the value column for various business assets, including John's medical practice, all of which the court awarded to John. The court awarded financial accounts to both parties. Most but not all of the accounts were in John's name. The court awarded John two deferred compensation benefits accounts, totaling $26,276. Lana received a retirement account, titled in John's name, totaling $572,276. The court also awarded Lana funds in several checking and savings accounts totaling $425,172. The court awarded John two checking and savings accounts totaling $72,991. The court also awarded John the Seward home, the interest in Mobile IV, a number of vehicles, and various pieces of personal property. It awarded Lana the Anchorage, Girdwood, and Mexico homes.

John appeals the superior court's property division.

## III. DISCUSSION

### A. The Superior Court Did Not Deny John Due Process.

#### 1. John waived his argument that the superior court denied him due process by failing to investigate whether he was competent at trial, but even if he had not, it fails on the merits.

John argues that the superior court violated his due process rights by not inquiring into the severity of his depression, which he testified about at trial, to determine whether he was competent to litigate. This argument is both waived and unpersuasive.

---

accepted Lana's proposed valuation of the asset at $350,000 in light of the uncertainty caused by John's failure to provide disclosures.

John's argument that due process required the superior court to investigate his competency sua sponte fails because he does not acknowledge existing procedures meant to account for such situations and provides no on-point legal support for his argument. Civil Rule 60(b) allows litigants to seek relief from judgment if they were not competent to litigate.[5] John has neither used this process nor explained why this process is constitutionally inadequate. "An issue is considered abandoned . . . if the appellant inadequately briefs the issue."[6] John asserts that due process guarantees self-represented litigants certain protections and suggests that the superior court failed to provide these by not questioning his competency sua sponte. But he does not point to any case law supporting this position, nor does he employ our framework for

---

[5] *See* Alaska R. Civ. P. 60(b) ("On motion and upon such terms as are just, the court may relieve a party or a party's legal representative from a final judgment, order, or proceeding . . . ."); *Stockton v. Stockton*, 532 P.3d 735, 736 (Alaska 2023) (litigant moved for relief from judgment under Rule 60(b) on grounds that severe depression left her incompetent during divorce proceedings); *Rapoport v. Tesoro Alaska Petroleum Co.*, 790 P.2d 1374, 1377 (Alaska 1990) (holding "[g]enuine and severe medical disability generally suffices as excusable neglect" for purposes of Civil Rule 60(b)).

[6] *Bragg v. Teslow*, 533 P.3d 533, 542 n.39 (Alaska), *as revised on reh'g* (Aug. 18, 2023) (alteration in original) (quoting *Sengul v. CMS Franklin, Inc.*, 265 P.3d 320, 330 n.41 (Alaska 2011)).

determining whether existing procedures satisfy due process.[7]  John has inadequately briefed this issue and has therefore waived the argument.[8]

However, assuming that in some cases a litigant's statements at trial would require the superior court to sua sponte inquire into the litigant's competency, John's statements fall short of that threshold.  In *Stockton v. Stockton*, we affirmed the superior court's finding that a litigant suffering from severe depression during divorce proceedings was competent.[9]  Although the litigant testified that she was "basically bedridden" for roughly nine years due to her depression, "spending approximately 20 to 22 hours in bed every day," she also testified that "she was able to engage in activities such as driving long distances and caring for her grandchild" during the same period.[10] We saw no error in the superior court's finding that, based on this testimony, it was "inconceivable that [her] depression was so debilitating" that she could not meaningfully participate in the proceedings.[11]  And in *Rapoport v. Tesoro Alaska Petroleum Co.* we affirmed the superior court's competency finding regarding a litigant who argued depression rendered him intermittently incompetent, relying largely on his

---

[7]     *See D.M. v. State, Div. of Fam. & Youth Servs.*, 995 P.2d 205, 212 (Alaska 2000) ("When determining the requirements of due process, we look to the test enunciated by the United States Supreme Court in *Mathews v. Eldridge*."); *Mathews v. Eldridge*, 424 U.S. 319, 335 (1976) ("[I]dentification of the specific dictates of due process generally requires consideration of three distinct factors:  First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail.").

[8]     *See Bragg*, 533 P.3d at 542 n.39.

[9]     *Stockton*, 532 P.3d at 737, 739.

[10]    *Id.* at 737.

[11]    *Id.* at 739.

ability to lucidly participate in "numerous complex business dealings during the period of alleged incapacity."[12]

John's case resembles those of the litigants in *Stockton* and *Rapoport*. John spoke of being sad, overwhelmed, and isolated from his family. He mentioned several times during the trial that he was suffering from depression. But Lana's testimony indicates that John was able to provide care for his minor child during the relevant period — similar to the appellant in *Stockton*. And like the *Rapoport* appellant, John was able to meet his professional obligations. John is a physician who has maintained his own medical practice for a number of years while also renting office space to other businesses and investing in a medical start-up. John's testimony indicated that he continued to manage these business affairs, albeit with some difficulty, throughout the pre-trial phase and into trial, undercutting his position that he was incompetent during this period.

John's representations about his mental health before and during trial were not so striking as to call into question whether he was in fact functioning at a level that would enable him to participate effectively in the case. Therefore, even had John not waived his competency argument, it would fail on the merits.

### 2. The superior court adequately accommodated John's self-represented status.

John argues that the superior court violated his due process rights when it barred him from litigating the marital estate without providing him with adequate guidance about the preclusion order's effects. John does not appeal the preclusion order itself. Instead he argues the superior court did not explain it well enough. Superior court judges have a duty to "inform a pro se litigant of the proper procedure for the

---

[12] *Rapoport v. Tesoro Alaska Petroleum Co.*, 790 P.2d 1374, 1375-77 (Alaska 1990).

action he or she is obviously attempting to accomplish."[13]  "We review the adequacy of the superior court's assistance to a pro se litigant for abuse of discretion."[14]

We see no abuse of discretion.  The record shows that the superior court offered John guidance about proper procedure throughout the proceeding.  The court explained the effect of the preclusion order to John at the outset of trial.  And the preclusion order was clear on its face:  "John Cates is barred from litigating the marital estate (i.e. the identification of marital assets, the valuation of those assets, and the equitable apportionment of the marital estate), whether through the presentation of testimony, the proffering of exhibits, or cross-examination."  In support of this sanction, the order detailed the superior court's authority for issuing the order and described John's "willful and protracted" failure to comply with pre-trial disclosure requirements.[15]  The superior court did enough to explain the preclusion order to John.

## B. The Superior Court Properly Accounted For Separate Assets In Dividing The Marital Estate.

John challenges the superior court's classification of the parties' homes and certain financial accounts.  John argues that the court did not credit non-marital funds in certain accounts.  He also claims that all the homes are his separate property.  We disagree with John's characterizations.

---

[13]  *Breck v. Ulmer*, 745 P.2d 66, 75 (Alaska 1987).

[14]  *Sarah D. v. John D.*, 352 P.3d 419, 428 n.24 (Alaska 2015).

[15]  Although the order was broad, we have upheld similar sanctions for similar noncooperation by a litigant.  In *Coffland v. Coffland* we upheld a Rule 37 preclusion order significantly restricting a husband's ability to litigate his divorce after the husband "failed to respond to motions, failed to file documents with the court in a timely manner, . . . failed to appear at pretrial proceedings," and failed to comply with a motion to compel discovery.  4 P.3d 317, 320, 322 (Alaska 2000).

When dividing property upon divorce the superior court must follow a three-step process: (1) determine what property is available for distribution; (2) find the value of this property; and (3) divide the property equitably.[16]

To determine what property should be divided upon divorce, the court first distinguishes between separate property and marital property.[17] Generally speaking, "property is separate property if it was acquired by a spouse before the marriage, and property is marital property if it was acquired by a spouse during the marriage."[18] Marital property is subject to division upon divorce, but separate property is not unless "the balancing of the equities between the parties requires it."[19]

"The [superior] court's underlying factual findings on classification and valuation of marital property are reviewed for clear error."[20] "[W]hether the trial court applied the correct legal rule . . . is a question of law that we review de novo using our independent judgment."[21]

John argues that because the superior court did not allow him to present evidence, its ultimate decision treated his separate property as marital property without sufficient factual basis. John may be correct that the court lacked a full and accurate picture of the property available for distribution because of the preclusion order. Had John complied with discovery rules, he would have been able to offer the sort of testimony and evidence he now argues the superior court should have considered. But

---

[16] *Chotiner v. Chotiner*, 829 P.2d 829, 831 (Alaska 1992); *Doyle v. Doyle*, 815 P.2d 366, 368 (Alaska 1991).

[17] *Kessler v. Kessler*, 411 P.3d 616, 618 (Alaska 2018).

[18] *Id.*

[19] *Id.* (quoting AS 25.24.160(a)(4)).

[20] *Urban v. Urban*, 314 P.3d 513, 515 (Alaska 2013).

[21] *Aubert v. Wilson*, 483 P.3d 179, 186 (Alaska 2021) (alterations in original) (quoting *Grove v. Grove*, 400 P.3d 109, 112 (Alaska 2017)).

because he did not comply, the superior court precluded him from presenting this evidence, and he does not challenge that order on appeal. Therefore we review the superior court's classification decisions in light of the limited evidence contained in the record.

We first address disputed retirement accounts. "Retirement benefits earned during marriage are marital assets subject to equitable division."[22] Lana testified that she and John received statements in the mail for a "KMS SEP" pre-tax account during their marriage. She also testified that she found a statement for a "Merrill Edge" pre-tax account from December 2017, when the parties were still married, in the Anchorage residence. Although these accounts were in John's name alone, Lana's testimony supports the superior court's finding that that they were marital property. Her testimony demonstrates that at least some of the value in the accounts accrued during the marriage. Therefore those portions of the accounts, at minimum, are presumptively marital.[23] Without testimony or other evidence from John rebutting the marital character of the accounts (e.g., by providing documentation of separate funds he deposited in those accounts prior to the marriage), the superior court could rely only on Lana's evidence in classifying and allocating them.[24] In light of the fact that the parties were married for more than seventeen years, the court's determination that the retirement accounts were marital property was not clearly erroneous.

---

[22] *Gambini v. Hamilton*, 440 P.3d 184, 193 (Alaska 2019) (citing *Edelman v. Edelman*, 3 P.3d 348, 356 (Alaska 2000)).

[23] *See Brennan v. Brennan*, 425 P.3d 99, 105-06 (Alaska 2018) ("Marital property generally includes all property acquired during the marriage, except for property received by one spouse as a gift or inheritance, and property acquired in exchange for separate property which is maintained as separate.").

[24] *See Hicks v. Pleasants*, 158 P.3d 817, 826 (Alaska 2007) ("Where a party identifies a significant marital asset but presents no evidence as to its value, the best practice is for the trial court to direct the parties, or the delinquent party having best access to the proof, to fill the evidentiary void.").

We next turn to disputed bank accounts. John's claim that the superior court ignored the rule that "assets acquired before marriage and after the date of separation are not considered marital property" is untrue. Lana testified that one of the disputed accounts, a checking account in John's name, had a balance of $62,374 at the time the parties separated in 2018. As of July 2020 this account showed a balance of $186,834.16, an increase of almost $125,000. The superior court valued the account at $62,374 — and allocated it to John. That meant that the court counted only the $62,374 as marital property, and John received the balance of the account as his separate property. The superior court properly accounted for John's separate property in the disputed accounts.

We next address the couple's homes. The record indicates that the parties purchased two of their homes during the marriage, and the other two belonged to John before the marriage.

"Marital property generally includes all property acquired during the marriage, except for property received by one spouse as a gift or inheritance, and property acquired in exchange for separate property which is maintained as separate."[25] But separate property may become marital in different ways.

First, "separate property may 'transmute' into marital property through an implied interspousal gift."[26] To find transmutation by implied gift, the court must decide whether the owning spouse intended "to 'donate' or 'convey' separate property to the marital unit or marital estate."[27]

---

[25] *Brennan*, 425 P.3d at 105-06.

[26] *Id.* at 106.

[27] *Kessler v. Kessler*, 411 P.3d 616, 619 (Alaska 2018) (quoting *Sparks v. Sparks*, 233 P.3d 1091, 1094 (Alaska 2010), *overruled on other grounds by Engstrom v. Engstrom*, 350 P.3d 766 (Alaska 2015)).

Second, a non-owning spouse may acquire an interest in the other spouse's separate property under the doctrine of active appreciation.[28] "Active appreciation occurs when marital funds or marital efforts cause a spouse's separate property to increase in value during the marriage."[29] "For this doctrine to apply, there must be (1) appreciation of separate property during marriage; (2) marital contributions to the property; and (3) a causal connection between the marital contributions and at least some part of the appreciation."[30]

The superior court did not conduct a clear transmutation or active appreciation analysis for any of the properties. However, the record supports the court's treatment of these properties as marital, either because they were purchased during the marriage or because they were transmuted.

The record supports the superior court's determination that the Seward and Mexico homes were marital. Lana testified that she and John purchased both properties during the marriage. She testified that they held title to the Mexico property jointly. Considering Lana's testimony in light of the rule that property acquired during the marriage is generally marital, it was not clear error for the court to have found these properties to be marital property.[31]

The record also supports the conclusion that the Anchorage home was transmuted to marital property. Although John stated that he owned the Anchorage home before the marriage, the parties both testified that he conveyed it to Lana during the marriage, and their testimony supports the notion that this conveyance was meant to make the property marital. Moreover, Lana testified that the parties paid off the

---

[28] *Odom v. Odom*, 141 P.3d 324, 333-34 (Alaska 2006).

[29] *Id.* at 333 (quoting *Harrower v. Harrower*, 71 P.3d 854, 857-58 (Alaska 2003)).

[30] *Id.* at 334.

[31] *See Brennan*, 425 P.3d at 105-06.

mortgage on the residence during the marriage. Recognizing that John was prohibited from offering evidence of his subjective intent in conveying the Anchorage property to Lana, the parties' testimony sufficiently establishes John's donative intent for transmutation purposes.[32] It was therefore not clear error for the superior court to treat the Anchorage home as marital property.

Finally, although the question is close, we cannot say the superior court clearly erred in finding the Girdwood property to be marital under the doctrine of active appreciation. Lana introduced two different appraisals of the Girdwood property — one estimating the value of the home at $515,000 and the other estimating the value at $487,900. Lana testified that John came into the marriage with the Girdwood property, but she also testified that the parties made substantial renovations to the home during the marriage, totaling at least $175,000. Her testimony supports the notion that the parties' marital contributions resulted in active appreciation of a substantial portion of the Girdwood property's value.[33] Although John owned the home before the marriage, the parties were married for more than seventeen years, during which time they paid off the mortgage on the property. Given these facts, a significant share of the property's value is marital.[34] Because John's failure to comply with discovery orders deprived the parties and the court of evidence that might have allowed the court to make a more

---

[32] *See Kessler*, 411 P.3d at 619; *see also Hall v. Hall*, 426 P.3d 1006, 1010 (Alaska 2018) (indicating fact marital funds were used to pay off mortgage on 137-acre lot "suggests that some, if not all, of the 137 acres were marital property").

[33] *See Odom*, 141 P.3d at 333-34; *Kessler*, 411 P.3d at 622 ("[S]ome portion of the home might be marital property under the doctrine of active appreciation if the home increased in value as a result of marital contributions to the property."); *id.* at 622 n.32 (" 'Marital contributions' can consist of both 'marital funds and marital efforts,' including the expenditure of 'time and energy.' " (quoting *Schmitz v. Schmitz*, 88 P.3d 1116, 1125 (Alaska 2004))).

[34] *See Kessler*, 411 P.3d at 622.

precise finding, we cannot say that the court clearly erred in classifying the entire property as marital.

### C. The Superior Court Did Not Clearly Err By Valuing An Investment Asset At $350,000.

John claims the superior court clearly erred by valuing the couple's investment in a medical technology business (Mobile IV) at $350,000. "[F]actual determination of property value[] is . . . reviewed for clear error."[35] "Clear error exists when we are 'left with a definite and firm conviction that the superior court has made a mistake.' "[36]

As a threshold matter, we do not consider certain tax documents that John presents on appeal to support this argument. These documents were not presented to the superior court, so they are not part of the record we may consider on appeal.[37]

We see no clear error in the court's valuation of the investment. Lana testified that, shortly before separation, John gave her a handwritten document showing the value of the Mobile IV investment as $350,000. She testified that she had no independent knowledge of the investment's value. John contends that had he been allowed to testify about the investment, "the court would have learned that the business had not gotten off the ground." But John was precluded from offering such testimony because he repeatedly failed to comply with discovery orders, and he does not challenge the court's preclusion order on appeal. The $350,000 figure was Lana's best estimate of the investment's value based on John's own representations. This evidence is sufficient to support the superior court's finding.

---

[35] *Wiegers v. Richards-Wiegers*, 420 P.3d 1180, 1182 (Alaska 2018).

[36] *Ethelbah v. Walker*, 225 P.3d 1082, 1086 (Alaska 2009), *as corrected on reh'g* (Mar. 26, 2010) (quoting *Josephine B. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 174 P.3d 217, 220 (Alaska 2007)).

[37] Alaska R. App. P. 210(a) ("Material never presented to the trial court may not be added to the record on appeal.").

John argues that "[t]he court could have easily gleaned from Lana's testimony that this business was operating at a loss as she testified that there was a cash call for $257,000 from the investors." This argument is unpersuasive. Partnerships may make cash calls for various reasons, not just because a business is operating at a loss.[38] It was therefore not unreasonable for the superior court to rely on the estimate John provided Lana to value the asset, without inferring from her testimony about the cash call that the business must necessarily be worth far less. We are not "left with a definite and firm conviction that the superior court has made a mistake."[39]

## IV. CONCLUSION

For the foregoing reasons, we AFFIRM the superior court's order in full.

---

[38] *See, e.g.*, *W. Alaska Bldg. & Constr. Trades Council v. Inn-Vestment Assocs. of Alaska*, 909 P.2d 330, 336 n.13 (Alaska 1996) (noting corporation made cash call "to fund interim construction costs before the approval of [a] construction loan").

[39] *Josephine B.*, 174 P.3d at 220.