Walter A. FERNAU, Appellant,

v.

Elizabeth A.F. ROWDON, Appellee.

No. S–9142.

Supreme Court of Alaska.

March 1, 2002.

Kenneth C. Kirk, Anchorage, for Appellant.

Chrystal Sommers Brand, Baxter Bruce Brand P.C., Juneau for Appellee.

Before: FABE, Chief Justice, MATTHEWS, EASTAUGH, BRYNER, and CARPENETI, Justices.

## OPINION

CARPENETI, Justice.

## I. INTRODUCTION

Elizabeth Rowdon and Walter Fernau had three children. After Elizabeth filed for divorce, the parties agreed to a hybrid divided

custody situation, but disputed child support and rehabilitative alimony. Because Walter worked in a well-paying career in medicine while Elizabeth stayed home to care for the children, the trial court awarded Elizabeth increased child support under Alaska Rule of Civil Procedure 90.3(c), rehabilitative alimony, and partial attorney's fees. Walter appeals these awards. Because they are justified by the circumstances of this case, we affirm.

## II. FACTS AND PROCEEDINGS

### A. Facts

Elizabeth Rowdon (formerly Fernau) and Walter Fernau married in 1985. They had three children together: Erin was born in 1982; Sarah was born in 1987; and Theodore was born in 1990. When the parties began living together in 1982, Elizabeth was attending nursing school and working as a surgery technician. Walter was a doctor finishing up his residency. Elizabeth did not finish her education. Instead, during the marriage, Elizabeth stayed home to care for the children, working part-time at most. She followed Walter in his medical career, traveling with him from Wisconsin to Germany in 1983, then to Fairbanks in 1990. The parties purchased a house in Fairbanks. From 1992 to 1995, Walter worked as a locum tenens[1] in Petersburg, flying there every two weeks for work with the Petersburg Hospital while the family remained in Fairbanks. In 1995 the family moved to Petersburg, where Walter's position with the Petersburg Hospital had changed to full-time contract employment. Rather than sell the Fairbanks house they rented it out, although the rental income was often sporadic.

Walter was able to command a substantial yearly income as a physician. In the years prior to the divorce, Walter earned $130,020 in 1997, $137,588 in 1996, $135,387 in 1995, $95,312 in 1994,[2] and $125,820 in 1993.

Elizabeth, on the other hand, earned only minimal wages in her part-time endeavors during the marriage. For example, she earned $6,398 in 1997, $2,706 in 1996, $4,132 in 1995, $220 in 1994, and $1,124 in 1993.[3]

In June 1997 Elizabeth filed for divorce. In August, Walter began discussing the possibility of changing his work schedule at Petersburg Hospital to accommodate the child custody schedule. Walter offered either to have his on-call time scheduled during the two-week period in which he did not have the children, or to cut back to a three-quarter or even half-time schedule. Ultimately his schedule was cut back to three-quarter time with a corresponding salary reduction from $150,000 to $112,000, effective from September 1, 1997 through September 1, 1998.[4] Walter's contract with the Petersburg Hospital expired at the end of August 1998. By that time his annual earnings for 1998 had already exceeded $72,000.

Walter also considered the possibility of starting his own practice or doing locum tenens work on a two-week-on, two-week-off basis. He estimated that he could earn approximately $60,000 to $70,000 in either of these positions, although starting his own practice would entail incurring debt for start-up costs. He preferred to stay in Petersburg, and ultimately decided to open his own practice. After August 1998 Walter apparently began setting up his own practice.

Walter suggested that another job option he was considering was changing professions.

1. A locum tenens is "a person who undertakes the professional duties of someone else in his or her absence, esp. a physician or member of the clergy who stands in for another, a person who holds office temporarily." New Shorter Oxford English Dictionary at 1616 (1993).

2. Elizabeth states that Walter's tax returns indicate that he earned $93,157 based on income as a locum tenens of $44,505 and staff physician wages of $48,652. However, his pre-tax income as a locum tenens was actually $46,440 and his staff physician wages were actually $48,872, for a total of $95,312.

3. Elizabeth indicates she earned $1,021, but again, that is post-tax. The pre-tax amount is $1,124.

4. While Walter's full-time schedule required him to work 31.5 hours per week, the three-quarter time work schedule resulted in the same per-week work hour requirement-thus Walter's salary was reduced without a corresponding reduction in scheduled working hours. However, his new contract provided that he would not be on call during alternating two-week blocks.

In a pre-trial brief, filed *pro se*, he stated: "Let[']s be honest. If I had been anything other than a physician, we wouldn't be at this stage."

Elizabeth, in turn, had decided that the best way for her to remain in Petersburg[5] and become economically self-sufficient was to return to school and get her teaching certificate. Towards that goal, she took positions in the Petersburg schools as a part-time teacher's aide and substitute teacher. Through tele-conference classes and summer school in Juneau at the University of Alaska Southeast, Elizabeth estimated that she could graduate in August 2003, while maintaining a part-time work schedule. The estimated cost of this education was $31,868. At the time of trial, Elizabeth was earning approximately $415 a month.

### B. Proceedings

Custody was resolved after a settlement conference with Senior Justice Jay A. Rabinowitz. A trial on property division, child support, and alimony was held July 29 and 30, 1998 before Superior Court Judge Michael A. Thompson.

### 1. Child custody

Walter and Elizabeth agreed to, and were awarded, joint legal custody. The parties elected a hybrid physical custody situation. Based in part on her preferences, the eldest child, Erin, was to spend seventy-five percent of the time with her mother. The other two children would divide their time equally between their parents, spending two weeks at a time with each parent. However, the children also were to spend after-school hours with Elizabeth during Walter's custody period. During the summer, when Elizabeth would need to be in Juneau for six weeks for summer school, the parties agreed that the base plan would be adjusted to allow Erin to be with Elizabeth for four of the six weeks and the other two children to spend their two weeks (of the six) with Elizabeth. The custody arrangement is not disputed.

### 2. Property division

The trial court found that "the marriage ... straddled the primary career building years for [Elizabeth]. [Elizabeth] has yet to complete her education, and thus has only poverty level job market skills." The trial court then divided the marital property unequally in order to help provide for Elizabeth during the four to five year period it would take for her to get her teaching credential. Notably, despite Walter's high wages, the parties had a modest estate: the Fairbanks residence, estimated to be worth approximately $91,000, generating monthly rent of $800; the marital portion of Walter's unvested PERS account valued at $28,854.86; Walter's Federal Thrift Savings Plan (TSP) account valued at $7,676.80; Walter's Civil Service retirement valued at $29,872.62; Elizabeth's retirement account valued at $369; savings bonds valued at $153,200.22 for the children's education;[6] and other personal property.

The court awarded Walter approximately thirty-seven percent of the property, with the remaining sixty-three percent awarded to Elizabeth, as follows: the court awarded Walter the Civil Service retirement account and his PERS account (totaling $58,727.48) as well as specific items of personal property; Elizabeth was awarded the Fairbanks residence and any proceeds from that property, the TSP account, and her own retirement account (totaling $99,045.80), as well as specific personal property; and the parties were each granted the authority to control the "investment placement of one-half of the children's present funds."

The unequal property division is not disputed.[7]

---

5. Elizabeth testified that she would have moved to Juneau, but that Walter had opposed a move away from Petersburg.

6. No one disputes that this money is reserved for the children's education.

7. Elizabeth points out that Walter had included an issue about the property division in his state-

ment of points on appeal but that he did not brief that issue in his opening brief. She contends that because Walter actually "concurs that the trial court's decision on property division was 'undeniably appropriate' the issue should be deemed waived." Walter only argues in his reply that the "property division still matters" to the award of attorney's fees. Because Walter

### 3. *Child support*

At trial, Elizabeth presented expert testimony about the economic impact of the divorce on her. She submitted evidence that she would need approximately $45,000 per year to cover expenses and her education.

Based on the determination that Walter's occupation as a doctor afforded him the ability to "earn substantial sums," Judge Thompson concluded that Walter's earning capacity was "in the highest category for purposes of [Civil Rule] 90.3." The court then calculated Walter's child support obligation on the then-existing cap of $72,000 under former Civil Rule 90.3 for a total of $1,980 per month for the three children.

On reconsideration in October 1998, the court clarified this award. In response to Walter's request that child support be lowered, the court first noted that Walter "ignore[d] the fact that his gross income for tax purposes for 1998 exceeded $72,000 by the end of August," and that he "rarely netted less than $6,000 per month" with the exception of the last four months of 1998, during which time Walter was taking steps to set up his own practice. The court then adhered to its view that Walter was "in the very highest category under [Civil Rule] 90.3."

The court calculated child support based on the *Turinsky v. Long*[8] hybrid support method, but included the rehabilitative alimony of $500 paid from Walter to Elizabeth in the calculation of Elizabeth's child support obligation. Under this method of calculation, Walter owed $1,477.85 per month.[9] The court concluded that this reduction in child support from the $1,980 previously ordered resulted from including the alimony payment in Elizabeth's income, bringing her above the federal poverty level. The court did not include income from the Fairbanks property in Elizabeth's income because it was too uncertain. The court stated that "[r]ather than engaging in some tempting legal fiction to avoid this anomaly, it seems most straightforward to simply hold that there was and is good cause to vary the child support award" under Rule 90.3(c), and that it would be manifestly unjust to do otherwise. The award was left at $1,980, as originally ordered.

### 4. *Rehabilitative alimony*

Judge Thompson noted that Walter had "largely accepted" that there was a need for spousal support. Concluding that Elizabeth's request for $1,000 per month from August 1998 through July 2000 and then $1,500 per month until she completes her teaching certificate was excessive and that "joint belt tightening" was required, the court ordered $500 per month in rehabilitative alimony until July 2000 and then $1,000 per month until graduation in 2003. This award was conditioned on Elizabeth being "enrolled as a student on the career track described at trial" and the increase was to be effective at the same time child support would be reduced when Erin turned eighteen.

### 5. *Attorney's fees*

Walter incurred attorney's fees of approximately $20,000 while Elizabeth's fees were approximately $22,000. The court awarded Elizabeth interim attorney's fees of $10,000. After trial, the court reaffirmed the award of $10,000 and increased it by $2,000 for a total award of attorney's fees to Elizabeth of $12,000. Walter had also previously agreed to and had paid $3,000 in Elizabeth's attorney's fees for the parties' mediation.

Walter appeals the award of child support, rehabilitative alimony, and attorney's fees.

### III. *STANDARDS OF REVIEW*

 Awards of child support are re-

---

has not briefed the question whether the unequal property division is appropriate, we deem the issue to be waived. *See Adamson v. Univ. of Alaska*, 819 P.2d 886, 889 n. 3 (Alaska 1991).

**8.** 910 P.2d 590, 596–98 (Alaska 1996).

**9.** This support obligation was based on Walter's annual income of $72,000, Elizabeth's annual income of $12,520 (calculated from monthly income of $500 alimony, $415 part-time work, and $128.33 Permanent Fund dividend income), Erin's custody at seventy-five percent with Elizabeth, and Sarah and Teddy's custody shared equally.

viewed for abuse of discretion.[10] Whether the proper method of calculating child support was applied is a question of law we review *de novo*.[11] "In reviewing questions of law, we will 'adopt the rule of law that is most persuasive in light of precedent, reason, and policy.' " [12] "The superior court's factual findings regarding ... net income are subject to the clearly erroneous standard of review." [13]

■ A trial court's decision regarding rehabilitative alimony is reviewed for abuse of discretion.[14]

■ "The award of attorney's fees in divorce actions is within the broad discretion of the trial court. An award of attorney fees will not be reversed unless it is arbitrary, capricious, or manifestly unreasonable." [15]

## IV. DISCUSSION

### A. The Award of Child Support Was Not Erroneous.

Child support in Alaska is awarded pursuant to the calculations provided in Civil Rule 90.3. When the case involves a hybrid custody situation, we apply the formula set forth in *Turinsky v. Long*.[16] The parties do not dispute the applicability of *Turinsky* to this case. However, Walter contends that the trial court erred in calculating child support because it incorrectly calculated the parties' annual incomes and it improperly applied Rule 90.3(c).

### 1. The trial court's findings as to the parties' income were not clearly erroneous.

#### a. Walter's income

■ Walter argues that the trial court's conclusion that he is in "the very highest category" for child support is clearly erroneous. He contends that the only evidence presented as to his earning capability was $60,000 as a *locum tenens* or $70,000 in private practice. Although Walter concedes that child support calculations can be based on historical earnings, he argues that it was error to do so here because there was no finding that he was voluntarily underemployed and no evidence to suggest that he "was actually making more than the income cap."

Elizabeth argues that the court's recognition of "the speculative nature of Walter's prospective income" was appropriate, as was its use of Walter's historical earnings. We agree.

With respect to modification of child support, we have held that "a trial court should be reluctant to modify child support obligations when the obligor's loss of income appears only temporary." [17] Walter's historical ability to earn well over $100,000 annually, together with the fact that he had earned more than $72,000 at the time the court considered his motion for reconsideration in 1998, belie his testimony that he could only earn $60,000 or $70,000. While he may have had extra expenses and less income in the first months of setting up his practice at the end of 1998, that appeared to be only a

---

**10.** See *Spott v. Spott*, 17 P.3d 52, 55 (Alaska 2001).

**11.** See *id.*

**12.** *Id.* (citing *Guin v. Ha*, 591 P.2d 1281, 1284 n. 6 (Alaska 1979)).

**13.** *Routh v. Andreassen*, 19 P.3d 593, 595 (Alaska 2001).

**14.** See *Nicholson v. Wolfe*, 974 P.2d 417, 426 (Alaska 1999).

**15.** *Sloane v. Sloane*, 18 P.3d 60, 64 (Alaska 2001) (internal citation omitted).

**16.** *Turinsky v. Long*, 910 P.2d 590, 596–98 (Alaska 1996) (concluding that in "a hybrid situation

... neither Civil Rule 90.3(a) nor Civil Rule 90.3(b) would exclusively determine the support required for all the children. In such a situation, a trial court should, subject to Rule 90.3(c), rely on both Rule 90.3(a) and Rule 90.3(b) to calculate child support.... The second step in determining divided custody support is for the court to carefully consider whether the support amount should be varied under paragraph (c)(1)(A).").

**17.** *Patch v. Patch*, 760 P.2d 526, 530 (Alaska 1988); see also *Curley v. Curley*, 588 P.2d 289, 291 (Alaska 1979) (stating that the "change ordinarily must be more or less permanent rather than temporary.").

temporary condition.[18] The evidence supports the trial court's conclusion that Walter was in the very highest category for purposes of child support calculations.

### b. *Elizabeth's income*

 Walter argues that the court erred in calculating Elizabeth's income for several reasons: her potential income as a full-time worker should have been used rather than her alimony payment; Elizabeth has other skills that would allow her to earn more than the combined alimony and part-time income of $915; and the rental income from the Fairbanks property should have been included.

Civil Rule 90.3(a)(1) defines adjusted annual income for purposes of calculating child support. It includes "total income from all sources...." A number of deductions are permitted including "child support and alimony payments arising from prior relationships" that the parent whose income is being calculated must pay.[19] By implication, then, alimony payments ordered in the case before the court are not deductible. The rule is silent as to whether alimony payments received by the parent whose income is being calculated should be included within the concept of total income from all sources. Since alimony for federal income tax purposes is regarded as income to the recipient and income for Rule 90.3 purposes is generally at least as broad as income for tax purposes, it is understandable that the superior court included within Elizabeth's income the alimony she is to receive. But we believe that alimony received from a person who is a party to the order should not be counted as income. It would be inconsistent to prohibit the party who is paying such alimony from deducting the same as income, as the rule by implication does, while at the same time requiring the recipient to add the alimony to her income. This would conflict with the

"percentage of income approach" on which our child support rule is based. This approach relies on the total income of both parents as the measure of the amount that the parents should pay for the support of their children.[20] By disallowing a deduction for alimony by the payor while requiring that alimony received be added to the income of the payee, total parental income would be overstated. Our conclusion in this respect is supported by implication in the commentary to Civil Rule 90.3 which includes as income "spousal support received from a person not a party to the order."[21] Because spousal support received from a person who is a party to the order is not expressly included, it is impliedly excluded.

Thus, it was error to include rehabilitative alimony paid by Walter in calculating Elizabeth's income for purposes of calculating child support. However, we conclude that this error was harmless for two reasons: (1) as discussed below, income from the Fairbanks property should have been included in the calculation, and the Fairbanks income (not counted) almost exactly cancelled out the alimony (counted); (2) the court ultimately based its award on Civil Rule 90.3(c), which allows the court to "vary the child support award as calculated under the other provisions of [Rule 90.3] for good cause upon proof by clear and convincing evidence that manifest injustice would result if the support award were not varied."[22]

Walter's contention that the court should have calculated Elizabeth's income as if she were working full-time because otherwise he is "subsidizing" her "career change" is unsupported. On appeal, he argues that "while it may not be unwise for the wife to go back to school to pursue a nursing degree, it is unfair that the husband should have to subsidize that decision through child support,"

---

18. In his reply brief on his motion for reconsideration, Walter asked the court to "set his adjusted gross income to $50,000 for the three months of [October, November, and December] 1998 ... [then] adjust[] this to the maximum of $72,000 in three months." This request supports the trial court's conclusion that any reduction in his earning potential was temporary.

19. Alaska R. Civ. P. 90.3(a)(1)(B).

20. Alaska R. Civ. P. 90.3 Commentary II.

21. Alaska R. Civ. P. 90.3 Commentary III.A.17.

22. Alaska R. Civ. P. 90.3(c)(1). *See* discussion *infra* Part IV.A.2.

citing to *Pattee v. Pattee*.[23] He contends that the trial court should have concluded, based on an estimation of her earning capability (and assuming that she was voluntarily underemployed), that she could have earned more than $915 per month ($500 alimony and $415 part-time earnings). But he did not make this argument to the trial court.[24] Walter's position in his pre-trial brief and at trial was that he supported Elizabeth completing her education. He said that he "should help out" with her education, even though he did not want to be responsible for all of it.

Walter's reliance on *Pattee v. Pattee* for the proposition that "this court has generally not forced one parent to subsidize the other parent's career change through child support" is misplaced. In *Pattee*, the husband (the noncustodial parent) had a job that he quit in order to return to school.[25] We stated that we did "not believe that an obligor-parent should be 'locked in' to a particular job or field" but that we would not require the custodial parent "to finance the noncustodial parent's career change."[26] *Pattee* is inapposite. It did not involve a situation where the noncustodial spouse had given up his career-building years to be a homemaker and care-giver to three children. In this case, it is the custodial parent and former homemaker, Elizabeth, who seeks job training to become self-sufficient. She previously did not have the chance to pursue a career due to the parties' choice that she take care of the family while Walter furthered his career.

Walter also argues that because Elizabeth has other skills, the court should have attributed more income earning potential to her. Again, Walter did not argue this below. What he did argue was that the trial court should have considered both of their incomes at $50,000 per year for purposes of child support. This argument is unsupported. He had already earned more than $72,000 by September 1998 and he improperly asked the court to include child support in Elizabeth's income to calculate her support obligation. It was not clearly erroneous for the trial court to calculate a part-time income for Elizabeth based on her historical earnings.

Walter takes issue with the trial court's failure to include income from the Fairbanks property in Elizabeth's income. The trial court concluded that any income from that property was uncertain at best given that the property was to be sold; moreover, Elizabeth had testified that receipt of rent was sporadic. The court also concluded that the Fairbanks property was distributed as part of the property division and as such was, in part, "the means to [Elizabeth's] reentry into the work-a-day world." Because Elizabeth suggested to the trial court that she might have some income from this property, whether from sale proceeds or rent, it was error not to include proceeds from this property in her income. However, because the difference in the support calculation under *Turinsky*—with the Fairbanks property included but not the rehabilitative alimony—is negligible,[27] we conclude that any error was harmless.

Because the trial court ultimately based the child support award on Civil Rule 90.3(c),

---

**23.** 744 P.2d 658, 662 (Alaska 1987) (overruled in part on other grounds by *Nass v. Seaton*, 904 P.2d 412, 416 n. 7 (Alaska 1995)).

**24.** Accordingly, we do not consider it. *See Zeman v. Lufthansa*, 699 P.2d 1274, 1280 (Alaska 1985).

**25.** 744 P.2d at 659.

**26.** *Id.* at 662.

**27.** The trial court's *Turinsky* calculation resulted in a child support obligation for Walter of $1,477.85 based on Walter's income of $72,000, Elizabeth's income of $12,520, Erin spending seventy-five percent of her time with Elizabeth,

and the other two children spending equal time with their parents, except for after school time.

As noted above, rent from the Fairbanks property was uncertain because it had been paid in cash only sporadically due to one of the tenants performing work in lieu of rent during some months. At most—that is, if it were received every month—Elizabeth's annual income would have been $16,116 and Walter's support obligation would have been $1,428.35—a difference of $49.50. Calculating child support with multiple uncertainties is, at best, an inexact science. Under these circumstances, any error in the final calculations was so small as to be harmless. *Duffney v. Duffney*, 625 N.W.2d 839, 843 (Minn. App.2001) (finding omitted source of income *de minimis* not warranting remand).

we turn now to the question of whether the award under Rule 90.3(c) was proper.

### 2. The trial court did not err by varying the child support award under Civil Rule 90.3(c).

Walter does not argue that the court improperly applied the hybrid custody formula or that the child support obligation calculated under that formula ($1,477.85) was incorrect. He argues that the court's adjustment of that figure under Civil Rule 90.3(c) to $1,980 was "uncalled for" because neither party asked for the Rule 90.3(c) variance, he had no opportunity to contest the application of that variance, Elizabeth had waived the argument, and "the variation was initially based on circumstances which were not likely true." Walter argues that because Rule 90.3(c)(1) allows variance only "upon proof by clear and convincing evidence that manifest injustice would result if the support award were not varied," this matter should be reversed for application of a "straight hybrid custody determination, without adjustment under 90.3(c)."

Elizabeth argues that good cause to vary the award was shown and applied as required by *Turinsky*. We agree with Elizabeth.

### a. The parties had the opportunity to contest a Civil Rule 90.3(c) variance.

 Walter's contention that there was no opportunity to oppose the variance under Civil Rule 90.3(c) is without merit. After the court issued its initial order in this case Walter filed a motion for reconsideration of the child support award, arguing that his annual income was only $50,000 and that child support should be calculated on his having custody of the children for an average of forty-two percent of the time. Elizabeth opposed the motion, presenting an extensive argument as to the applicability of the *Turinsky* formula and the basis for good cause to vary the award under *Turinsky* and Rule

90.3(c). Walter filed an equally extensive reply, in which he too applied the *Turinsky* formula for divided custody and argued why his support obligation should not be varied upward.[28]

### b. The trial court properly relied on the terms of the custody agreement when it determined child support.

 In varying the support award, the trial court relied on the provision in the parties' custody agreement that the children were to spend after-school hours with Elizabeth even during their custody weeks with Walter. Walter argues that this provision in the custody agreement was not sufficient evidence to support the variance because there was no evidence that the parties would follow the agreement "now that the father was no longer working at the Petersburg hospital." He contends that the higher child support award for Erin (at a 75/25 split) should have more than offset any cost to Elizabeth. But this argument is also without merit, for Walter misperceives who carries the burden of showing that the custody order is not being followed. Child support orders should follow custody orders.[29] There was no evidence that the agreement into which the parties voluntarily entered was *not* being followed at the time the court made its decision. And the child support for Erin was not an "offset" for the increased time the other two children spent with their mother.

### c. Application of the Civil Rule 90.3(c) variance was not error.

 Walter contends that this matter should be remanded for a straight hybrid custody determination. We disagree. Civil Rule 90.3(c)(1) allows the trial court to vary a child support award "for good cause upon proof by clear and convincing evidence that manifest injustice would result if the support

---

**28.** Walter's argument that Elizabeth waived this issue is likewise without merit. Both parties agree that this is a divided custody arrangement and Elizabeth clearly argued for variance in her opposition to Walter's motion for reconsideration, to which he responded.

**29.** *See Turinsky v. Long*, 910 P.2d 590, 595 (Alaska 1996).

award were not varied."[30] The commentary to Rule 90.3 states that there is a second step in divided custody support in which "the court [is] to carefully consider whether the support amount should be varied under paragraph (c)(1)(A). A divided custody case should be treated as an unusual circumstance under which support will be varied if such a variation is just and proper."[31]

We have stated that the "good cause" required for a Civil Rule 90.3(c) variance "is to be determined by the context in which it is used. That context, for Civil Rule 90.3 purposes, *must* focus first and foremost on the needs of the children."[32]

The record supports the conclusion that the superior court did not err in applying the Civil Rule 90.3(c) variance. The trial court expressly relied on the inexact nature of the actual percentages of custody (due to the extra time the children were to spend with Elizabeth as provided for in the custody agreement) when it concluded that "there is reason to vary the percentages in such a way that a complete shared custody child support calculation under [Rule] 90.3(b)(1)-(3) should be avoided as not reflective of the parties['] means, needs, or responsibilities."

The nature of this hybrid custody situation, including the additional time the children were to spend with their mother, as well as the disparity in earning potential, and Elizabeth's need to pursue a career opportunity while caring for three children, make this an unusual case in which variance is just and proper. We therefore affirm the Civil Rule 90.3(c) variance of the child support award.

### C. The Trial Court's Award of Rehabilitative Alimony Was Not Erroneous.

[19, 20] Walter challenges the award of rehabilitative alimony and argues that the estimates made by Elizabeth's expert as to her financial needs are highly suspect. Walter insists that her income is much higher than the court recognized. Walter contends that the alimony increase is based on their eldest child reaching eighteen. He then distinguishes *Hammer v. Hammer*[33] and argues that a $500 per month increase is excessive given that child support would be reduced by only $360.

Elizabeth argues that Walter waived this issue by not including it in his statement of points on appeal. But she contends that if the question is reached, the award was proper because Walter's position at trial was that she should receive rehabilitative alimony. Because of the conditional nature of the alimony and the lesser amount awarded than was

---

30. Former Alaska R. Civ. P. 90.3(c)(1) provides: The court may vary the child support award as calculated under the other provisions of this rule for good cause upon proof by clear and convincing evidence that manifest injustice would result if the support award were not varied. The court must specify in writing the reason for the variation, the amount of support which would have been required but for the variation, and the estimated value of any property conveyed instead of support calculated under the other provisions of this rule. Good cause may include a finding:
(A) That unusual circumstances, such as especially large family size, significant income of a child, divided custody as defined by paragraph (f) of this rule, health or other extraordinary expenses, or unusually low expenses, exist which require variation of the award in order to award an amount of support which is just and proper for the parties to contribute toward the nurture and education of their children. The court shall consider the custodial parent's income in this determination; or
(B) a finding that the parent with the child support obligation has a gross income which is below the poverty level as set forth in the Federal Register. However, a parent who would be required to pay child support pursuant to paragraph (a) or (b) must be ordered to pay a minimum child support amount of no less than $50.00 per month except as provided in paragraphs (a)(3) and (b).

31. Former Alaska R. Civ. P. 90.3 Commentary VI.B.3. (internal quotation marks omitted).

32. *Doyle v. Doyle*, 815 P.2d 366, 373 (Alaska 1991) (internal citation and quotation marks omitted; emphasis in original). While not exhaustive, examples of good cause are also given in Rule 90.3(c), and include "unusual circumstances" and consideration of the custodial parent's income. Former Alaska R. Civ. P. 90.3(c)(1). Divided custody cases are considered unusual circumstances. Former Alaska R. Civ. P. 90.3 Commentary VI.B.3. A separate section now addresses the hybrid custody situation. Alaska R. Civ. P. 90.3 Commentary V.E.

33. 991 P.2d 195, 198–99 (Alaska 1999).

requested, Elizabeth argues that the award was appropriate based on the evidence before the court.

We conclude that Walter has not waived this issue and that the award of rehabilitative alimony was appropriate in these circumstances.

 The preference in Alaska is to resolve the financial concerns arising from a divorce by means of the property division,[34] but spousal maintenance may be awarded if it is just and necessary.[35] We will set aside the award only if "the trial court abused its discretion when determining whether [it] is just and necessary." [36] We "leniently review [] awards of limited duration, such as the one here." [37] And an increase in alimony that is timed with a decrease in child support may be appropriate,[38] depending on the facts and circumstances of the case.

 Rehabilitative alimony is appropriate "when the recipient spouse intends to apply the alimony toward job training designed to lead to employment." [39] Its purpose "is to allow a recipient spouse who exits a marriage with few job skills and little earning capacity to secure a means of earned income." [40] We recently reiterated the circumstances in which rehabilitative · alimony may be awarded:

> [A] separate form of temporary support, rehabilitative alimony, may be appropriate in some cases for a specific purpose and a short duration even with an adequate property division. While an award of rehabilitative alimony need not be predicated on a finding that the parties' needs cannot be met through the division of marital property, this form of alimony is narrowly restricted to job training or other means

directly related to entry or advancement within the work force, and the party seeking rehabilitative alimony must intend to use it for such purposes.[41]

"[A] spouse's educational plan is sufficient for the purpose of supporting a rehabilitative alimony award if the spouse identifies a career goal, a degree program aimed at realizing that goal, and a time frame during which the degree may be earned through reasonable diligence." [42]

Elizabeth met the requirements for rehabilitative alimony. She had identified her choice to become a teacher, the costs, and the time required for her education (while still fulfilling her obligations as a mother). And the trial court found that "[t]he need for spousal support was largely accepted by [Walter], at least for some or all of the proposed educational course for [Elizabeth's] teaching credential." However, the court noted that if it awarded her the alimony she requested ($1,000 per month from August 1998 to July 2000 and $1,500 per month thereafter until August 2003 when she would graduate), her income could exceed Walter's income, at least in the short term. The court therefore reduced the amount of rehabilitative alimony, to reflect the need for "joint belt tightening," awarding $500 per month until July 2000 and $1,000 per month thereafter, contingent on Elizabeth's enrollment in the teacher certificate program.

### 1. The unequal property division alone did not provide for the parties' needs.

The record supports the unequal division of property in this case. The parties had a modest marital estate and a gross disparity in earning potential. The unequal division of

---

34. *See Brown v. Brown,* 914 P.2d 206, 209 (Alaska 1996) (holding property division preferable to alimony for providing for a party's needs).

35. *See* AS 25.24.160(a)(2).

36. *Jones v. Jones,* 835 P.2d 1173, 1178 (Alaska 1992).

37. *Tybus v. Holland,* 989 P.2d 1281, 1287–88 (Alaska 1999).

38. *See Hammer,* 991 P.2d at 198–99.

39. *Jones,* 835 P.2d at 1178–79.

40. *Nicholson v. Wolfe,* 974 P.2d 417, 426 (Alaska 1999).

41. *Edelman v. Edelman,* 3 P.3d 348, 358 (Alaska 2000) (quoting *Davila v. Davila,* 876 P.2d 1089, 1094 (Alaska 1994)).

42. *Virgin v. Virgin,* 990 P.2d 1040, 1043 (Alaska 1999) (quoting *Myers v. Myers,* 927 P.2d 326, 328 (Alaska 1996)).

property was only the first step in allowing Elizabeth the opportunity to get back on her feet after spending the majority of her adult life as a homemaker.

### 2. *The trial court did not abuse its discretion in determining the alimony award was just and necessary.*

Elizabeth estimated her educational costs at $31,868 (or approximately $6,300 per year for five years). She also estimated her living expenses at approximately $38,000 per year, exclusive of educational costs. Thus, her average yearly financial requirement, through graduation, totals just under $45,000.

The court had awarded Elizabeth $1,980 in monthly child support, and attributed to her part-time earnings of $415 per month and $128.33 per month for her permanent fund dividend. This equals $30,280 per year. The court did not include any income from the Fairbanks property because of the uncertainty involved and the fact that it was awarded as part of the property settlement to help Elizabeth get back on her feet. Even if rental income from the Fairbanks property is included, Elizabeth's yearly income would be approximately $39,000.

The award of $500 per month, increasing to $1,000 per month after July 2000, was not an abuse of discretion. It served to increase her income to enable her to complete her education while meeting her other financial obligations. In *Hammer v. Hammer*, we upheld an increase of alimony upon child support decreasing because of the need to maintain a fixed income.[43] In *Hammer*, the mother's alimony was set to increase from $1,400 per month to $1,600 per month upon the child's eighteenth birthday when child support in the amount of $1,200 per month would end. Because the mother would be able to return to work full-time when the

parties' only child reached the age of majority, the moderate increase in alimony of $200 per month was intended to supplement her expected ability to earn $1,000 per month.[44]

In this case, when Erin turned eighteen, Elizabeth would still have two young children to care for, while she attended school and continued to work part-time. She would not be able to work full-time. The award of rehabilitative alimony is predicated on specific, time-limited educational or career goals. Walter has a clearly established ability to earn a substantial income and the court recognized the need for "belt tightening" when it awarded substantially less in rehabilitative alimony than was requested. The increase in rehabilitative alimony of $500 per month was intended in part to maintain a fixed income for Elizabeth and the children as child support dropped when Erin reached eighteen while Elizabeth was in school—a finite period of time. Because the child support award decreases by over $500[45] per month upon Erin's eighteenth birthday, an increase in alimony of $500 per month was not error.

### D. *The Trial Court Did Not Abuse Its Discretion in Awarding Attorney's Fees.*

■ Walter argues that the unequal division of the marital estate provided Elizabeth with adequate resources to pay for her own attorney. Elizabeth argues that requiring Walter to pay fifty-three percent[46] of her attorney's fees was not an abuse of discretion.

■ "Attorney's fees in divorce cases are 'based on the relative economic situations and earning powers of the parties,' rather than prevailing party status. This rule ensures that 'both spouses have the proper means to litigate the divorce action on a

---

43. *Hammer*, 991 P.2d at 198–99.

44. *Id.* at 198.

45. Using yearly income of $16,116 for Elizabeth (based on monthly income of $800 rental income, $415 for part-time work, and $128 for her PFD) and $72,000 per year for Walter, when Erin reaches age eighteen, Walter's child support obligation for Sarah and Teddy would be $943 per month, a reduction of over $500 from the

straight *Turinsky* calculation for the three children and more than a $1,000 reduction of his Rule 90.3(c) obligation for the three children.

46. Elizabeth's total attorney's fees exceeded $22,000. Walter agreed to pay $3,000 for mediation costs. He was later ordered to pay $10,000 for her attorney's fees in an interim order, and at the end of trial the court ordered him to pay an additional $2,000.

**1060**

fairly equal plane.' " [47] "Generally, a court will award costs and fees only to the economically disadvantaged divorce litigant." [48]

We have held that where resources from a property division "are sufficient for the superior court to reasonably expect [a former spouse] to pay [his or] her own fees, it is not an abuse of discretion to require [him or] her to do so." [49] But we have also concluded that where the parties are not in comparable economic situations, it is not an abuse of discretion to award partial attorney's fees.[50]

In this case, Elizabeth has only poverty level job prospects while Walter has substantial earning capabilities. The parties were not placed on an equal economic plane through the property division. Furthermore, Walter incurred over $20,000 in attorney's fees for his own attorney. Given the explicit reliance on relative economic situations for awards of attorney's fees in divorce cases, the vast disparity in the economic situations of Walter and Elizabeth, and a marital estate with few assets, we find no abuse of discretion in the trial court's award of partial attorney's fees to Elizabeth.

## V. *CONCLUSION*

Elizabeth gave up her career-building years to take care of the parties' three children while Walter furthered his medical career. The division of the parties' modest estate was not sufficient to place the parties on equal financial footing given the vast disparity in their earning abilities. Because unusual circumstances exist to justify varying the child support award under Civil Rule 90.3(c), because the requirements for rehabilitative alimony were satisfied in this case, and because a partial award of attorney's fees to Elizabeth was warranted by the parties' relative economic situations, we AFFIRM the trial court's decision in all respects.

---

**47.** *Sanders v. Barth,* 12 P.3d 766, 768 (Alaska 2000) (internal citations omitted).

**48.** *Nicholson v. Wolfe,* 974 P.2d 417, 427 (Alaska 1999).

**49.** *Davila v. Davila,* 908 P.2d 1027, 1035 (Alaska 1995).

**50.** *See Doyle v. Doyle,* 815 P.2d 366, 373 (Alaska 1991).