NOTICE

*Memorandum decisions of this court do not create legal precedent. A party wishing to cite such a decision in a brief or at oral argument should review Alaska Appellate Rule 214(d).*

THE SUPREME COURT OF THE STATE OF ALASKA

| | | |
|---|---|---|
| NORMAN P. HAYNES, | ) | |
| | ) | Supreme Court No. S-18379 |
| Appellant, | ) | |
| | ) | Superior Court No. 3PA-17-2375 CI |
| v. | ) | |
| | ) | MEMORANDUM OPINION |
| LINDA L. HAYNES, | ) | AND JUDGMENT[*] |
| | ) | |
| Appellee. | ) | No. 1987 – August 16, 2023 |
| | ) | |

Appeal from the Superior Court of the State of Alaska, Third Judicial District, Palmer, Jonathan A. Woodman, Judge.

Appearances: John C. Pharr, Law Offices of John C. Pharr, P.C., Anchorage, for Appellant. No appearance by Appellee Linda L. Haynes.

Before: Maassen, Chief Justice, Carney, Borghesan, and Henderson, Justices. [Pate, Justice, not participating.]

## I. INTRODUCTION

A man filed for divorce from his wife after almost 30 years of marriage. The wife had been a stay-at-home mother to their four children, and the husband had worked in the oil industry. The court granted a divorce and awarded 90% of the marital estate to the wife and 10% to the husband, a division proposed by the husband. The husband appeals, arguing that the court erred by using his proposed percentages but the

---

[*] Entered under Alaska Appellate Rule 214.

wife's proposed property values. We conclude that the court did not err in its division of the property and therefore affirm the judgment.

## II.    FACTS AND PROCEEDINGS

### A.    Facts

Norman and Linda Haynes married in Georgia in 1987 and have four children, all now adults. The family moved to Alaska in 1989. Until 1994 Norman served in the military; he then worked in law enforcement before going into the oil industry, working both on the North Slope and overseas. Linda has a bachelor's degree in medical technology that she has not used since 1992. She had various jobs while their children were young but was primarily a stay-at-home mother. The couple also ran a fishing guide business together for over a decade during the times Norman was not working away from home.

In September 2014 Norman moved out of the marital home in Wasilla (the Hygrade Lane house) and moved in with his girlfriend. Within a year he began identifying his girlfriend as his wife for purposes of his medical and life insurance, though he testified she never claimed or received benefits. In 2016 Norman was transferred to Kuwait, worked there until 2019, then was transferred to his company's corporate office in Houston, Texas, where he worked until being laid off in 2020. At the time of trial he remained in Houston, supporting himself and his girlfriend, who could not work due to her immigration status.

Both Norman and Linda are in their 60s. At various times since Norman moved out in 2014, Linda has cared for three young grandchildren who needed constant care because of their specialized health needs.

### B.    Proceedings

#### 1.    Pre-trial

Norman filed for divorce in October 2017. In an interim order the following March, the court ordered him to pay Linda's mortgage, utilities, car

payments, and auto insurance, plus $2,400 a month in spousal support, $5,000 for attorney's fees, and $2,500 toward her training to become a pastor. For the next several years the case made little progress. In early 2020 Norman retained an attorney and explained that it had been difficult for him to participate in the case as a self-represented litigant while he was living and working in Kuwait.

### 2. Trial

Trial was held in July 2021. Norman testified that Linda's refusal to work outside the home and her spending habits were both points of contention in their marriage and that he moved out in 2014 because he was "just done." He testified that he then paid Linda support before the court ordered him to, also paying her mortgage and car payment and to replace her furnace. He estimated his gross income in 2018 as approximately $300,000 and in 2019 as around $270,000.

Norman testified that he worried about his finances while unemployed and paying for three homes. He had a house in Palmer (the Coville Lane house) that he bought in 2016. He testified that no one was currently living there but he was trying to rent it out to cover the monthly mortgage payment. He testified that in 2020 he had $80,000 in his checking account but had not paid all of the court-ordered spousal support and attorney's fees because he was "looking at the future." He testified that he filed 20 to 30 job applications a week and at the time of trial had only $900 remaining in savings.

Norman told the court that Linda could have the Hygrade Lane house and a Mazda he had loaned her in 2015, and he offered to pay off her mortgage. He wanted to keep his 401(k) account valued at over $85,000, and the Coville Lane house. He argued that after seven years of separation he should not have to pay spousal support.

Linda testified that during the marriage she worked various jobs to help out but primarily cared for the couple's four children; she did not recall Norman ever

asking her to work more. From 1999 to 2011 she worked for the fishing guide business without compensation. At various times after 2014 she cared for three of their grandchildren, making the difficult decision to leave a fourth grandchild in foster care because she could not afford to take care of him. She testified that Norman had not paid spousal support since January 2021, that he owed her over $34,000 in court-ordered spousal support and attorney's fees, and that when he did pay support she used the money for household expenses and the needs of her grandchildren. She testified that she had not sought employment because of her child care responsibilities, the divorce case, and two custody cases involving her grandchildren, but that she had nonetheless been taking classes to advance her career.

Linda also testified about repairs needed at the Hygrade Lane house and asked the court to discount its value accordingly. She asked for $30,000 for future medical expenses, claiming that her many years without insurance had negatively affected her health and that she needed a lot of dental work. She testified that in order to get a job she would have to go back to school to update her degree or else settle for making around $15 an hour. Her preference was to become a licensed pastor, a job which would pay somewhere between $24,000 and $70,000 a year; the cost of training in that field would be around $38,000, which she asked that Norman pay. She also asked for $2,400 a month in lifetime alimony "while [she] lifetime [sic] take[s] care of his grandchildren." Both Norman and Linda testified about the value of their marital and non-marital property.

### 3. Court order

The court entered a decree of divorce about two months after trial, as well as findings of fact and conclusions of law. The court found that Norman had been the "main breadwinner" during the marriage and was in good health at the time. It found that Linda had worked as a homemaker during the marriage and that she would

"struggle to find a job using her [bachelor's] degree." The court then considered a number of factors relevant to the allocation of the marital estate, such as the parties' relative ages, health, past employment, and earning capacity. Given these considerations, the court decided to deny Linda spousal support and instead allocate 90% of the marital estate to her.

The court awarded the Hygrade Lane house to Linda and directed Norman to pay its mortgage. It found that the Coville Lane house was not marital property because Norman had bought it after the marriage ended in 2014. The court directed Norman to pay Linda the interim support he owed her. It found that only a small amount of money in Norman's 401(k) was marital and awarded the entire account to Norman. It denied Linda's request for $30,000 for future medical expenses and for funds to repair her home. The court accepted Norman's proposed values for almost half the property, including rifles and scopes, jewelry, a computer, a TV, some furniture, Norman's 401(k), and the parties' debts. It ordered Norman to pay Linda approximately $28,000 as an equalization payment.

### 4.    Post-decree

Both parties moved for reconsideration. Linda challenged a number of findings, including the denial of funds for home repairs, the designation of the Coville Lane house as Norman's separate property, and the failure to address her request for additional attorney's fees. Norman challenged the characterization of a few items of property, the valuation of the firearms, and the overall property division. He contended that he would not have proposed a 90/10 split of the marital estate in Linda's favor if he had known the court was going to use Linda's proposed values instead of his own, and he asked the court to eliminate the equalization payment.

On reconsideration, the court determined that it had overlooked Linda's request for attorney's fees and granted her an additional $10,000 "to level the playing

field." The court also corrected the marriage date and a few errors in the property spreadsheet but otherwise denied reconsideration.

Norman filed this appeal.

## III. STANDARD OF REVIEW

"The 'superior court has broad discretion when dividing property in a divorce proceeding and we will not disturb [a] property division unless it is clearly unjust.' "[1] "The award of attorney's fees in a divorce action rests within the broad discretion of the superior court[] and will not be disturbed on appeal unless it is 'arbitrary, capricious, manifestly unreasonable, or stems from an improper motive.' "[2]

## IV. DISCUSSION

### A. The Court Did Not Abuse Its Discretion By Awarding Linda 90% Of The Marital Estate.

"The division of the marital estate requires first that property owned by the parties be characterized as separate or marital, that the marital property then be valued, and finally that the marital property be allocated equitably."[3] Norman does not challenge the court's characterization of the parties' property as marital or separate. Nor does he challenge the valuation of any specific item of property, arguing only that his proposal for dividing the marital estate 90/10 in Linda's favor rested on his own proposed values, and because the court rejected his values it should not have adopted

---

[1]   *Gambini v. Hamilton*, 440 P.3d 184, 192 (Alaska 2019) (alteration in original) (quoting *Elliott v. James*, 977 P.2d 727, 730 (Alaska 1999)).

[2]   *Stevens v. Stevens*, 265 P.3d 279, 284 (Alaska 2011) (quoting *Koller v. Reft*, 71 P.3d 800, 808 (Alaska 2003)).

[3]   *Odom v. Odom*, 141 P.3d 324, 330 (Alaska 2006).

his suggested percentages. He contends, "Mr. Haynes obviously did not intend that Ms. Haynes should be awarded 90% of *any* marital estate."[4]

The equitable allocation of marital property upon divorce requires consideration of the statutory "*Merrill* factors":

> (A) the length of the marriage and station in life of the parties during the marriage;
> (B) the age and health of the parties;
> (C) the earning capacity of the parties, including their educational backgrounds, training, employment skills, work experiences, length of absence from the job market, and custodial responsibilities for children during the marriage;
> (D) the financial condition of the parties, including the availability and cost of health insurance;
> (E) the conduct of the parties, including whether there has been unreasonable depletion of marital assets;
> (F) the desirability of awarding the family home, or the right to live in it for a reasonable period of time, to the party who has primary physical custody of children;
> (G) the circumstances and necessities of each party;
> (H) the time and manner of acquisition of the property in question; and
> (I) the income-producing capacity of the property and the value of the property at the time of division[.][5]

These factors "are not exhaustive, and the court is not required to enter findings on each factor; the court's findings regarding the division of property need only be sufficient to indicate the basis of the court's conclusion."[6]

---

[4] In fact the court accepted Norman's proposed values for nearly half the marital property.

[5] AS 25.24.160(a)(4); s*ee Merrill v. Merrill*, 368 P.2d 546, 548 n.4 (Alaska 1962).

[6] *Hockema v. Hockema*, 403 P.3d 1080, 1088 (Alaska 2017).

One goal of the property division is to disentangle the parties' finances such that they can live independent of each other; therefore, "trial courts should, where possible, address spouses' financial needs through property distribution, rather than through awards of spousal support."[7] "When a couple has sufficient assets, the spouse with the smaller earning capacity can and should receive a larger share in the property distribution to aid him or her in [the post-divorce] transition."[8] "We have also noted that an unequal property division can be used to compensate one spouse for providing support [such as child-rearing] that allows another to increase his or her earning capacity."[9]

Here, the superior court considered a number of relevant *Merrill* factors in deciding on a 90/10 split of the marital estate: (1) the long duration of the marriage; (2) the parties' age and nearness to retirement; (3) Norman's demonstrated earning capacity of over $200,000 a year; (4) Linda's estimated earning capacity of $12 an hour; (5) Linda's lack of "access to health insurance" for several years after Norman removed her name from his policy; and (6) Linda's many years of staying home "as the parties' children's primary caregiver for a majority of the children's minority." The court denied Linda's request that she be awarded "rehabilitative alimony or reorientation alimony," noting that during the parties' seven-year separation she had "only slowly begun to reorient her life, despite receiving a significant amount of spousal support." The court also rejected Linda's request for an additional lump sum for retraining in pastoral care, finding that the property division would "suffice for [her] needs." The

---

[7]     *Id.* at 1089.

[8]     *Dundas v. Dundas*, 362 P.3d 468, 480 (Alaska 2015) (alteration in original) (quoting *Day v. Williams*, 285 P.3d 256, 261 (Alaska 2012)).

[9]     *Thompson v. Thompson*, 454 P.3d 981, 996 (Alaska 2019).

court's rationale adequately explained its allocation of the property, which is supported by the evidence; the fact that the allocation does not reflect Norman's position is irrelevant to its validity.

Last, Norman argues that the court failed to find that he could pay the equalization payment without hardship. "Cash awards are a permissible means of dividing illiquid marital assets *where they would not impose a hardship on the paying party*."[10] Norman's only hardship-based argument in the superior court was that he was "unemployed despite mighty efforts to become re-employed and cannot afford the equalization payment."

The court responded to this argument by noting not only the difference in the parties' employment prospects, but also that Norman had "significant post-separation assets," including both the Coville Lane house (standing empty at the time of trial) and his 401(k), valued at over $85,000. We conclude that the superior court properly considered the potential hardship of the equalization payment and adequately explained why it was appropriate. Because the property division, including the equalization payment, was not clearly unjust, we affirm it as within the superior court's broad discretion.

### B. The Court Did Not Abuse Its Discretion By Awarding Additional Attorney's Fees On Reconsideration.

Awards of attorney's fees in divorce cases are generally intended "to ensure that 'both spouses have the proper means to litigate the divorce action on a fairly equal plane.' "[11] The superior court's discretion is broad, though "[i]n exercising this

---

[10] *Fortson v. Fortson*, 131 P.3d 451, 459 (Alaska 2006) (emphasis added).

[11] *Stevens v. Stevens*, 265 P.3d 279, 290 (Alaska 2011) (quoting *Fernau v. Rowdon*, 42 P.3d 1047, 1059-60 (Alaska 2002)).

discretion, the superior court must focus on the parties' relative economic situations and earning capacities."[12]

Norman contends that the superior court erred when, on reconsideration following its ruling on the property division, it awarded Linda an additional $10,000 in attorney's fees. He argues that the court made a mistake in applying the "level playing field" standard, which he contends "pertains to interim awards of attorney's fees," citing *Stevens v. Stevens*[13] as an example. But Norman is mistaken; *Stevens* involved an attorney's fees award following a property division trial, just as in this case.[14] Norman correctly points out that "a party who receives a property settlement sufficient to cover incurred attorney's fees should expect to pay his or her own attorney's fees," citing *Tybus v. Holland*.[15] But although Linda received 90% of the marital estate, this consisted primarily of the value of the marital home, whereas Norman had more liquid assets, more post-separation assets, and considerably greater earning potential. The court did not abuse its discretion when it took the parties' finances into account and awarded Linda additional attorney's fees under the divorce exception to Alaska Civil Rule 82.[16]

## V. CONCLUSION

We AFFIRM the judgment of the superior court.

---

[12] *Id.*

[13] *Id.*

[14] *See id.* at 283, 290-91.

[15] 989 P.2d 1281, 1289 (Alaska 1999).

[16] Norman also claims that the superior court erred when, after he had filed his notice of appeal, it reduced to judgment certain amounts he had been ordered to pay Linda, thus allowing her to execute. Although a trial court ordinarily cannot modify rulings that are on appeal, reducing a final order to judgment is not a modification.